JUAN BAUTISTA RIVERA, demandante y apelante, *v.*
WILLIAM C. DUNSCOMBE, demandado y apelado.

Núm. 10221.—*Sometido:* Enero 12, 1951.   *Resuelto:* Septiembre 30, 1952.

820

*Felipe B. Montalvo* y *Buenaventura Esteves,* abogados del apelante; *J. Alemañy Sosa,* abogado del apelado.

El Juez Asociado Señor Negrón Fernández emitió la opinión del tribunal.

Este es un pleito sobre alegada mala práctica (*malpractice*) de la medicina en Puerto Rico.

Juan Bautista Rivera demandó a William C. Dunscombe, médico cirujano, en reclamación de daños y perjuicios, alegando que el demandado fué. negligente en la aplicación que le hiciera de una inyección caudal en el tratamiento de una dolencia que el propio médico demandado diagnosticó como ciática. La alegada negligencia consistió en haber dejado de usar el demandado el grado de destreza, cuidado y circunspección usualmente usado en esos casos por otros médicos cirujanos en la comunidad, al no tomar radiografías adecuadas de la región afectada del cuerpo del demandante para así llegar a un diagnóstico correcto de su

dolencia y al no esterilizar debidamente la piel antes de la aplicación de la inyección. Esto último permitió, según el demandante, la penetración de bacilos infecciosos en sus músculos y sangre, lo que, en unión a otras infecciones producidas por la quemadura de tejidos al derramarse el líquido fuera de la región sacral, le produjo inflamación e infección de los músculos y tejidos de dicha región, por lo cual tuvo que someterse a varias operaciones.

Negó en su contestación el demandado la negligencia imputádale y a su vez situó en el propio demandante, por no seguir sus instrucciones y tratamiento y haber abandonado la hospitalización, la responsabilidad por cualesquiera daños sufridos.

Después de un juicio en sus méritos el tribunal a quo declaró sin lugar la demanda, y de dicha sentencia apeló el demandante, imputando al juez sentenciador error (1) al descartar la conclusión del Dr. Antonio Ramos Oller, quien declaró que la infección fué necesariamente llevada al cuerpo del demandante por una aguja infectada usada por el demandado al aplicarle la inyección caudal, y al resolver que tal conclusión no encuentra base en la prueba y que está en contradicción con el propio testimonio de dicho perito; (2) al permitir, con la oposición del demandante, que los testigos del demandado, Alberto Velázquez y otros declararan sobre el tratamiento y la técnica que usó con ellos el demandado con el fin de demostrar su reputación en cuanto a su pericia y cuidado en el tratamiento de casos similares, y (3) al actuar con pasión, prejuicio y parcialidad en la apreciación de la prueba y al dictar la sentencia apelada, por ser ésta contraria a los hechos y a la ley.

Sobre los hechos que a continuación resumimos no hay controversia, estando plenamente sostenidos por la prueba.

El 18 de febrero de 1948 el demandante fué a la clínica del demandado en la ciudad de Mayagüez, requiriendo de éste sus servicios médicos, informándole que sentía un fuerte

dolor en la pierna izquierda. Luego de examinarlo, diagnosticó su dolencia como ciática, aplicándole en la región del sacro una inyección de 8 cc. de novocaína al 2 por ciento en 22 cc. de solución salina. El demandante permaneció por algún rato en el cuarto de descanso o recuperación de la clínica y luego de pagar al demandado la suma de $15 por sus servicios, regresó a su residencia, en San Sebastián, guiando un camión de su propiedad. Una vez pasó el efecto de la inyección, el dolor le comenzó de nuevo y continuó aumentando, esta vez incluyendo la espalda. Ya en San Sebastián, consultó a un médico de la localidad, quien le administró calmantes. El dolor, no obstante, seguía cada vez más intenso.

El 20 de febrero, alrededor de las 8 de la mañana, el demandante volvió a la clínica del demandado, explicándole lo que ocurría. Fué entonces sometido a tratamiento de diatermia mediante aplicación de fomentos calientes en la región sacrolumbar. Tomó ciertas tabletas calmantes que le proporcionó el demandado, quien luego le aplicó una inyección de penicilina, más tarde una de morfina y después una de demerol, estas dos últimas para calmarle el intenso dolor que sentía. Siendo la clínica del demandado una de consultas y tratamientos ligeros, sin facilidades de hospitalización, éste condujo al demandante entre 4 y 5 de la tarde de ese día a la Clínica del Dr. Ramírez Quiles donde quedó hospitalizado. Allí, por instrucciones del demandado, se le continuó el tratamiento. El dolor, sin embargo, le siguió durante esa noche y después de tratar de localizar al demandado, el demandante abandonó temprano en la mañana la Clínica del Dr. Ramírez Quiles saliendo para San Juan, donde ingresó en el Hospital Pavía.

En dicho hospital se hizo ese día un diagnóstico tentativo de ciática y dislocación del disco invertebral. Se le administraron calmantes hasta el día 23. Se le hicieron análisis de sangre y orina, con resultado, el de orina, de tres cruces de albúmina, y el de sangre, de cuatro cruces en la reacción

wasserman, indicativo esto último de que padecía de sífilis. Se le tomaron radiografías de la región lumbar sin que pudiera comprobarse dislocación alguna del disco invertebral, descartándose aparentemente el diagnóstico anterior de dislocación de dicho disco. El 25 de febrero se hizo otro diagnóstico—también tentativo—de absceso perinefrítico. Finalmente el 28 y después de haber el Dr. Ramos Oller, cirujano del Hospital Pavía, operado al paciente, se hizo un diagnóstico de "absceso lumbar, después de anestesia caudal (*post caudal anesthesia*)." El 3 de marzo volvió el Dr. Ramos Oller a practicarle otra operación, habiéndole hecho incisiones adicionales en la misma región, y el 23 del mismo mes fué nuevamente operado en el mismo sitio. Luego de estas intervenciones el demandante estuvo bajo tratamiento en dicho hospital hasta el primero de abril, día en que abandonó el mismo. Continuó, sin embargo, recibiendo allí tratamiento y curaciones como paciente ambulatorio. A la fecha del juicio de este caso aún continuaba bajo dicho tratamiento.

Del 10 al 12 de diciembre de 1947—algo más de dos meses antes de la primera visita al demandado—el demandante recibió tratamiento en el Hospital Díaz García, hoy Hospital Pavía, para una afección o dolencia en la cintura, hacia la espalda, que fué diagnosticada como lumbago y tratada con aplicación de inyecciones de penicilina y diatermia. El 12 de diciembre de 1947 fué dado de alta.

A fin de poder considerar debidamente los errores señalados veamos cuál fué, en síntesis, la prueba de una y otra parte en relación con los actos de negligencia imputados al demandado.

El demandante ofreció, sobre dicho extremo, su propio testimonio y los de los Dres. Manuel Pavía Fernández, Antonio Ramos Oller y en *rebuttal*, además del suyo nuevamente, el del Dr. Ramos Oller, el del Dr. Emilio Vadi, y por estipulación en cuanto a que declararía lo mismo que éste, el del Dr. Juan Avilés.

El testimonio del demandante fué al efecto de que el 18 de febrero de 1948, mientras cargaba zinc en un almacén de Mayagüez, sintió un fuerte dolor en la pierna izquierda por lo cual se vió en la necesidad de recurrir a un médico. Estando la clínica del demandado cerca, visitó a éste para consulta. Ya allí "me inyectó (sic) una inyección por la parte de atrás, bien abajo terminando la espina dorsal". Mientras el demandado le aplicaba la inyección sintió mucho dolor en la espalda, lado derecho como si "se le fuera a levantar la piel para arriba". El demandado tardó como 5 ó 6 minutos en ponerle la inyección y no le desinfectó el sitio donde le aplicó la misma. Se le derramó un poco de líquido mientras se la ponía.

En la repregunta declaró que para ponerle la inyección lo habían acostado boca abajo; que a pesar de eso pudo observar cuando el demandado "cogió la aguja de un sitio, de un aparato que no podía explicar" lo que era. Afirmó nuevamente que no le habían desinfectado la región donde le aplicaron la inyección.

El Dr. Manuel Pavía Fernández, Director Médico del Hospital Pavía Fernández, de Santurce, declaró que la última vez que se hospitalizó el demandante en su clínica se quejaba de un fuerte dolor en la región lumbar derecha, el cual sentía hacía 3 ó 4 días. El día que ingresó "tenía fiebre alta, pulso rápido, se quejaba de un dolor muy agudo, estaba muy sensible a la palpación, con los tejidos flogosos, inflamados", siendo todos éstos signos de un absceso en formación. Lo tuvo bajo tratamiento 7 u 8 días, a pesar de lo cual no cedió la infección. Siguió el absceso en formación y el séptimo u octavo día llamó al Dr. Ramos Oller para que se hiciera cargo del caso.

En la repregunta: En diciembre de 1947 el demandante estuvo recluído en su hospital con una afección en la espalda, la cual fué diagnosticada como lumbago. El absceso del cual operó al demandante se formó en el mismo lado donde éste había sufrido el ataque de lumbago. En su opinión no

había relación alguna entre las dos enfermedades. El absceso que presentaba el demandante en febrero de 1948 no era una infección secundaria. Pudo haberse formado por causas externas o internas y la persona que estaba en mejores condiciones para determinarlo era el cirujano que lo operó.

El Dr. Ramos Oller, después de declarar sobre el tratamiento y operaciones a que sometió al demandante en el Hospital Pavía Fernández, afirmó que el absceso que se desarrolló en el demandante fué el resultado de una infección producida por el colibacilo; que el colibacilo solamente puede introducirse al cuerpo en esa región por medios mecánicos externos tales como un arañazo, la hincada de una aguja o clavo, una herida u otro medio mecánico similar. En virtud de estas consideraciones y existiendo el hecho de que el 18 de febrero de 1948 al demandante se le aplicó una inyección en la región del sacro, dedujo que el bacilo causante de la infección fué llevado a la región lumbar por la aguja que usó el demandado al poner la inyección. Fué de opinión que la inyección fué puesta fuera del canal del sacro porque si se hubiera puesto en este sitio no se hubiera producido el absceso del cual fué operado el demandante. Declaró que aunque pudo haber habido relación entre la condición de que padeció el demandante en diciembre de 1947 y el absceso del cual le operó, él no lo creía probable.

En la repregunta afirmó que no había necesidad de hacer ningún cultivo para determinar que el colibacilo fué el que produjo la infección, ya que el olor típico de ese bacilo "me indicaba que era el bacilo coli el que había penetrado en la infección". Habiéndose desarrollado una infección 48 horas después de haber sido puesta la inyección, era claro para él que dicha infección fué llevada por la aguja a la región infectada.

La prueba del demandado sobre el mismo extremo a que nos hemos contraído consistió de su propio testimonio, del de su auxiliar Carmen Cintrón y de los de los Dres. Nelson

Perea, Marshal Rockwell, José F. González, John Taylor y como *surrebuttal* nuevamente del testimonio del Dr. Nelson Perea.

El testimonio del demandado fué al efecto de que tuvo al demandante como paciente el día 18 de febrero de 1948. Éste se quejaba de un dolor "en la parte inferior de la espalda y este dolor se desarrolló por la parte atrás de la pierna izquierda, por la cadera". Le hizo un reconocimiento, que incluyó el examen de la espalda y de la pierna, tomándole también una muestra de sangre. Le sugirió una inyección de novocaína en el canal sacral y al aceptar el demandante se la aplicó. Al explicar la técnica que usó al poner la inyección, dijo lo siguiente: "Yo le puse en una mesa boca abajo, con la pelvis un poco elevada. Entonces limpié la piel con jabón, solución de jabón. Entonces se limpió con éter y alcohol. Entonces se le aplicaron tres manos de tintura. de metaphen . . . cuando yo estaba haciendo la asepsia de la piel la enfermera estaba esterilizando o hirviendo la jeringuilla especial y además que yo tengo (sic) en la mano una aguja especial." Declaró además que la aguja estuvo hirviendo por 10 minutos y que al preparar la inyección usó "dos soluciones que vienen preparadas de la factoría y garantizadas de ser estériles"; que después de la inyección "el demandante quedó en la mesa algunos minutos y después a los diez minutos le pasó la anestesia a las dos piernas, media anestesia y media parálisis"; que lo ayudó junto a la enfermera Cintrón a caminar hasta un cuarto de recuperación que existe en la clínica, donde estuvo como hora y media o dos horas. Luego se levantó y se fué para su casa.

En la repregunta: Hace 25 años que ejerce en Puerto Rico. Ha tratado un promedio de 5 a 6 casos de ciática al año. En los últimos dos años ha tenido alrededor de diez. Que él conozca, nunca se le ha infectado ninguna inyección, de las que puso al demandante, en los pacientes que ha tratado. Volvió a explicar detalladamente el método usado para la asepsia del demandante al ponerle la inyección de novo-

caína. El demandante es un hombre grueso, pero la inyección no estaba contraindicada para un hombre de su peso. A base del historial que le dió el demandante, pensó en la posibilidad de una infección en el riñón como origen de la ciática, lo cual habría de comprobar con el análisis de la muestra de sangre que le tomó y subsiguientes exámenes del demandante.

El testimonio de la auxiliar Carmen Cintrón fué al efecto de que el 18 de febrero de 1948 intervino con el tratamiento del demandante en calidad de ayudante del demandado Dr. Dunscombe; que esterilizó los instrumentos por 15 minutos hirviéndolos en un esterilizador que está funcionando todo el día; en ese esterilizador fué hirviendo las dos jeringuillas de 20 cc. y las agujas con que se aplicó la inyección; ayudó en la asepsia del paciente "le lavé la parte desde la cintura hasta abajo, más abajo del coxis con una solución de jabón líquido, luego le pasé éter, después se le pasó alcohol. Yo misma. Luego le di tres manos de tintura de metaphen." Una vez hervidas las jeringuillas y la aguja las llevó en una bandeja estéril. El doctor se puso unos guantes estériles y comenzó a llenar las jeringuillas "para inyectar". Después de la inyección y sintiendo el demandante los pies adormecidos ayudó al demandado a llevarlo al cuarto de recuperación. Como a las dos horas y media se fué de allí.

En la repregunta: No tiene título de enfermera auxiliar, nunca se ha examinado. La primera vez que vió al demandante fué el día 18 de febrero de 1948. El demandante es un hombre corpulento y el demandado un hombre de edad; ella pesa 108 libras. pero a pesar de eso pudieron entre ella y el Dr. Dunscombe, quien es un hombre de edad, cargar al demandante desde la camilla hasta el cuarto de recuperación, a una distancia de 20 metros.

El Dr. Nelson Perea declaró, en síntesis, lo siguiente: En su opinión el lumbago que sufrió el demandante durante el mes de diciembre de 1947, y para el cual fué tratado en el

Hospital Pavía Fernández mediante la aplicación de 6 millones de unidades de penicilina, tuvo relación directa con el absceso que sufrió el mencionado demandante durante el mes de febrero de 1948. De acuerdo a los exámenes de sangre y orina que se le hicieron en diciembre de 1947 y los que posteriormente se le hicieron en febrero de 1948, para esa fecha la condición del paciente había empeorado pues en diciembre tenía una cruz de albúmina en la orina y en febrero tenía tres cruces, indicativo esto que se había agravado. La ciática es siempre producida por un foco de infección localizado en alguna parte del organismo. El absceso no pudo haber sido producido como resultado de la inyección de novocaína que administrara el demandado al demandante, ya que dicho absceso se formó en un sitio muy distante de donde se puso la inyección. El absceso fué una infección secundaria.

Por orden de la corte examinó al demandante el 24 de septiembre de 1948. Ha tenido experiencia con inyecciones caudales en personas obesas y no ofrecen gran dificultad al ponerlas. Si la inyección se pone en el canal sacral produce el efecto típico de adormecer las piernas, "produce parálisis que algunas veces dura una, dos horas". La inyección que se le puso al demandante el 18 de febrero no tuvo relación alguna con su padecimiento al ingresar el 21 de ese mes en el Hospital Pavía Fernández. De haberse formado un absceso—como consecuencia de dicha inyección—éste debió haber sido un absceso sacral. La mayor parte de los abscesos perinefríticos se deben al colibacilo. Éste llega al riñón a través de la sangre. El haber el demandante abandonado el tratamiento el día 20 de febrero y suspendérsele la administración de penicilina durante los días 21 y 22 de ese mismo mes contribuyó a agravar su condición.

En la repregunta: El colibacilo habita normalmente en el colon, pero puede encontrarse en otros sitios del organismo. La inyección de novocaína es inofensiva, es un calmante y no está contraindicada en los casos en que el paciente tenga sífilis o albúmina. Si la inyección se pusiera fuera del canal

sacral y se formara, como consecuencia de ella, un absceso, éste estaría localizado superficialmente.

El Dr. Marshal Rockwell dijo lo siguiente: Es médico especialista en cirujía ortopédica. Los abscesos muy frecuentemente se forman como resultado de golpes. Se puede determinar si una infección la causa el colibacilo sin necesidad de hacer un cultivo. Expresó su criterio de que es imposible el que se forme un absceso en la región lumbar como consecuencia de una inyección puesta en el canal del sacro. Los abscesos en la región lumbar pueden ser producidos por infecciones en otras partes del cuerpo.

En la repregunta manifestó que una infección en cualquier parte del cuerpo "puede ser trasmitida a cualquier otra parte del cuerpo".

El Dr. José F. González declaró lo siguiente: Es médico cirujano, Director de la Clínica Betances de Mayagüez. En su opinión, de acuerdo a los récords del Hospital Pavía Fernández, el demandante venía sufriendo de una lesión en el riñón. Manifestaba trastornos renales desde la fecha en que ingresó por primera vez en el Hospital Díaz García, allá para el 10 de diciembre de 1947. El absceso en la región lumbar pudo haber ocasionado el trastorno del riñón y la ciática que diagnosticó el demandado, ya que esta última es una "secuela de algún foco de infección en alguna parte del organismo". Manifestó que si se pusiera una inyección fuera del canal sacral el cirujano se daría cuenta inmediatamente. El tratamiento dado al demandante por el Dr. Dunscombe fué el correcto y adecuado para un caso como el suyo. La causa determinante de la ciática que padecía el demandante el 21 de febrero al ingresar en el Hospital Pavía era "un absceso en formación en la región lumbar, y que era el factor predisponente, histológico de la ciática. Un absceso más o menos crónico . . ." el que "posiblemente tuvo su origen en la primera hospitalización cuando él se quejaba de dolor aquí (señalando), y se mejoró y podríamos decir se durmió por una temporada y entonces cuando sus defensas se debi-

litaron y su resistencia se disminuyó, el pus rompió por el punto más débil, por la región lumbar."

En la repregunta reafirmó su criterio de que con el tratamiento en el Hospital Pavía el absceso en formación "mejoró o se durmió" y que más tarde, al debilitarse su resistencia, surgió de nuevo. Una infección puede trasmitirse a un paciente por medio de la bata que usa el médico si ésta no está estéril; puede asimismo trasmitirse por las manos si en ellas no hay una adecuada asepsia. No ha tenido mucha experiencia con inyecciones de la clase que fué administrada al demandante. Sólo ha puesto tres o cuatro de éstas en su vida. Cree que es necesario hacer un examen físico superficial antes de poner una inyección para anestesia caudal. No es necesario tener una enfermera graduada al cuidado del paciente cuando éste sufre un dolor de ciática.

El testimonio del Dr. John Taylor fué el siguiente: Es médico cirujano, especialista en ortopedia. En la comunidad se usa novocaína como tratamiento para la ciática. Se pone una inyección de novocaína en el canal sacral y puede ponerse también en el nervio ciático. Una inyección puesta en el canal sacral no tiene relación con un absceso en la región lumbar. Los abscesos ocasionados por inyecciones siempre —según su experiencia—surgen donde penetra la aguja. Un absceso profundo en la región lumbar "casi siempre viene de la sangre o del riñón o puede ser linfático".

En la repregunta manifestó que las veces que ha usado novocaína como tratamiento para la ciática, la ha puesto directamente en el nervio ciático; nunca la ha puesto en el canal sacral. Para que pueda producirse una infección fuera del canal sacral la inyección tiene que ser puesta fuera de éste.

En *rebuttal* el demandante declaró que la enfermera Carmen Cintrón nunca intervino en la asepsia héchale al ponerle la inyección. El demandado no usó guantes ni tampoco le aplicó tintura de metaphen. Fué al cuarto de recuperación caminando, sin ayuda de nadie. Sólo estuvo allí alrededor de

25 a 30 minutos. Nunca sintió que se le adormecieran las piernas. Finalmente declaró que para la fecha en que visitó al Dr. Dunscombe pesaba 214 libras.

En la repregunta manifestó que a pesar de estar boca abajo mientras le ponían la inyección podía ver a cualquier persona que se le acercara. No había sentido que le pusieran nada para limpiarle la piel antes de ponerle la inyección.

El Dr. Ramos Oller, también en *rebuttal*, declaró lo siguiente: Una cruz de albúmina no es índice de que el riñón esté sufriendo una infección. Una fiebre puede dar tres cruces de albúmina. El absceso del cual operó al demandante no era uno de los conocidos como abscesos perinefríticos, ya que éste estaba localizado en el músculo sacroespinal. En una infección como la que sufría el demandante es muy difícil determinar cuál es su centro.

Al ser repreguntado en cuanto a si "es lo corriente que cuando se trata de infecciones profundas siempre se considera, a menos que haya prueba en contrario, que es el resultado de una infección interna del organismo", contestó en la afirmativa. También contestó afirmativamente al preguntársele si el lumbago de que padeció el demandante en diciembre de 1947 pudo haber debilitado los tejidos de la región lumbar al extremo de hacerlo propenso a la formación de un absceso debido a una infección a través de la sangre.

Por último, el Dr. Emilio Vadi Collazo declaró que hace 28 años que ejerce la medicina en Puerto Rico, habiendo trabajado 15 años en el Hospital Municipal de la Capital. La técnica usada por el demandado al poner la inyección al demandante fué errónea. Que "el concepto moderno, actual de la medicina es que los microbios que están fuera de la única manera que entran dentro de uno es que alguien los ponga dentro." Se le formó el absceso al demandante debido a que no se tomaron las medidas necesarias para una asepsia adecuada al administrarle la inyección caudal. La infección fué producida por colibacilo trasmitido por medio de la referida inyección.

En la repregunta: Ha puesto más de 1,600 inyecciones como las que puso el demandado. La infección pudo haber sido trasmitida a través de la sangre y llegar hasta el sitio donde se formó el absceso.

Como prueba de *surrebuttal* el demandado ofreció nuevamente el testimonio del Dr. Nelson Perea. Éste declaró que al recibir orden del tribunal para examinar al demandante, le tomó una radiografía del sitio donde fué operado. La misma no indicaba osteomielitis del sacro, aunque sí se notaba "una osteomielitis de los procesos transversales de las vértebras cuarta y quinta, pero no del sacro." En una de las hojas clínicas del Hospital Pavía Fernández, del día 25 de febrero de 1948, aparecía lo siguiente: "Impresión: Absceso perinefrítico". Una impresión es, según él, un diagnóstico tentativo.

En la repregunta manifestó que una impresión no es un diagnóstico.

No podemos convenir con el apelante en que el juez sentenciador cometió error al descartar la conclusión del Dr. Ramos Oller de que la infección fué necesariamente llevada al cuerpo del demandante por una aguja infectada al serle aplicada por el demandado la inyección caudal, y al resolver que tal conclusión no encontraba base en la prueba y que estaba en contradicción con el propio testimonio de dicho perito. Veamos el análisis del tribunal sentenciador del testimonio del Dr. Ramos Oller. Así se expresó dicho tribunal:

"(1) Aunque el Dr. Ramos Oller no hizo un cultivo del bacilo causante de la infección padecida por el demandante—forma científica de determinar con certeza la naturaleza o identidad del mismo—habiendo sido dicho facultativo el que operó al demandante estaba él en mejores condiciones, según declaró el Dr. Nelson Perea, para determinar la causa de la infección. Debemos, por lo tanto, aceptar la conclusión del Dr. Ramos Oller de que la infección que produjo el absceso fué causada por el colibacilo ya que se trata de una cuestión científica sujeta a determinación pericial médica.

"(2) La segunda conclusión del Dr. Ramos Oller fué controvertida por el propio demandado y sus peritos médicos los doctores Nelson Perea, José F. González, John Taylor y A. Pérez Toledo quienes declararon que el bacilo coli si bien habita normalmente en el colon se encuentra a menudo localizado en otros sitios del cuerpo tales como los dientes y las amígdalas y que de allí pueden pasar a otros sitios del cuerpo humano por el sistema circulatorio de la sangre y también a través del sistema linfático. El Dr. Perea declaró además que del 80 al 85 por ciento de las infecciones de los riñones son producidas por el colibacilo y el Dr. González declaró que casi todas las infecciones renales son producidas por el bacilo coli. El Dr. Emilio Vadi, perito del demandante, declaró que el absceso del demandante pudo haber sido producido por una infección del colibacilo trasmitida interiormente. El Dr. Pavía Fernández, perito también del demandante, quien lo examinó en su hospital en San Juan, declaró que un absceso como el que padecía el demandante podía deberse a algo interno. Y el propio Dr. Ramos Oller en su segundo testimonio prestado el día 12 de enero de 1949 declaró que cuando la infección es profunda, si no hay lesión local, se debe deducir que la infección es interna; que el demandante no presentaba signo externo de lesión. La prueba demostró que el absceso en este caso era profundo y de gran extensión.

"Debemos concluir, por lo tanto, que además de los medios mecánicos de que habló el Dr. Ramos Oller el absceso pudo también ser el resultado de una infección interna en el cuerpo del demandante. Fortalece esta conclusión el hecho de que ya en diciembre de 1947, o sea dos meses antes de la operación, el demandante fué tratado de fuerte dolor en la región lumbar y que para ello se le suministró penicilina y otros medicamentos propios para combatir estados infecciosos. Y la fortalece aún más el hecho de que cuando el demandante visitó al demandado el día 18 de febrero de 1948 tenía dolor en una pierna, signo inequívoco de un foco de infección. Recuérdese la declaración del Dr. Perea de que la ciática es siempre producida por un foco de infección en el organismo y la declaración del Dr. González de que un absceso en la región lumbar puede causar la ciática. Recuérdese también que el dolor que sintió el demandante cuando fué asistido en diciembre de 1947 ocurrió luego de recibir un golpe o torcedura en la espalda (*back sprain*) y téngase presente a este efecto la declaración del Dr. Rockwell de que los abscesos se forman muy a menudo como resultado de golpes.

"(3) La conclusión del Dr. Ramos Oller de que la infección fué necesariamente llevada al cuerpo del demandante por la aguja infectada usada por el demandado no encuentra base en la prueba y está en contradicción con el propio testimonio de dicho perito médico y debemos por lo tanto descartarla.

"Reconocemos que en esta clase de acciones, dada la naturaleza técnica de las cuestiones envueltas, se hace necesario confiar y depender en el testimonio de peritos médicos para llegar a conclusiones correctas. Porque, como dijo Aristóteles: 'De la misma manera que el médico debe ser juzgado por el médico, así los hombres deben ser juzgados por sus iguales.' Ello es así, sin embargo, cuando la opinión del perito médico se circunscribe a su ciencia sin traspasar el campo de la misma.

"Así, cuando el Dr. Ramos Oller opinó que el absceso que él operó al demandante en la región lumbar se debió a la presencia allí del colibacilo, dicho perito médico expuso una conclusión científica. Así también, cuando dicho facultativo opinó que el colibacilo sólo puede ser llevado a dicha región por medios mecánicos tales como un arañazo, la hincada de una aguja o un clavo o una herida, aunque dicha opinión fué disputada por los peritos del demandado, expresó una conclusión científica. Empero, cuando dicho testigo concluye que la infección fué necesariamente llevada al sitio por la aguja que usó el demandado al ponerle la inyección al demandante en 18 de febrero de 1948, habiendo otros medios según el propio perito por los cuales pudo producirse la infección, es claro que el testigo se salió de los límites del peritaje científico y penetró en el campo de las especulaciones personales. Ello es así porque dicho testigo no dijo en ningún momento que la única forma de penetrar el colibacilo en la región del absceso era por medio de una aguja hipodérmica. Por el contrario expuso otros medios mecánicos por los cuales podía producirse la infección y no excluyó la posibilidad de que en el caso de autos la infección hubiese sido producida por dichos otros medios. Es claro que la opinión del Dr. Ramos está basada en el hecho de que efectivamente el demandado había puesto una inyección de anestesia caudal al demandante en la región del sacro. Si no hubiese el Dr. Ramos Oller sabido tal hecho, ¿era posible que él llegase a la conclusión única de que una aguja hipodérmica fué el trasmisor habiendo otros medios posibles que él no excluyó científicamente? Una contestación negativa se impone.

"De aceptarse esta conclusión del perito Dr. Ramos Oller estaríamos violentando el principio antes enunciado de que no surge presunción o inferencia alguna de negligencia del hecho de que el paciente haya recibido un daño. De concluirse con dicho perito que por la existencia de la infección y por el hecho de que el demandado le aplicó una inyección en o cerca de la región al demandante, fué necesariamente la inyección lo que causó la infección, estaríamos de hecho aplicando la regla *res ipsa loquitur* rechazada por la jurisprudencia en esta clase de acciones.

"La declaración del Dr. Ramos Oller establece evidencia compatible con la hipótesis de que la infección fué producida por la aguja que usó el demandado al aplicar la anestesia caudal al demandante. También constituye evidencia compatible con la hipótesis de que no fué dicha aguja y sí otro medio mecánico externo como la hincada de un clavo, el rascarse con la uña o cualquier otra herida en el sitio, el que trasmitió dicho bacilo infeccioso al cuerpo del demandante. Dicha evidencia así producida es insuficiente para sostener la reclamación del demandante."

Un tribunal no está obligado a seguir indefectiblemente la opinión de un perito, sobre todo cuando el mismo está en conflicto con testimonios de otros peritos. *Autoridad Sobre Hogares* v. *Viera*, 72 D.P.R. 732; *León* v. *Comisión Industrial*, 58 D.P.R. 905; *El Pueblo* v. *Bonelli*, 19 D.P.R. 69 y *El Pueblo* v. *Sutton*, 17 D.P.R. 345. En este caso no solamente hubo conflicto entre el testimonio del Dr. Ramos Oller y los testimonios de los peritos del demandado si que también dicho testimonio, como bien apunta el juez sentenciador, no excluyó otros medios mecánicos a través de los cuales pudo haberse producido la infección y aceptó que cuando ésta es profunda—hecho éste que quedó definitivamente establecido—si no hay lesión local, signo que no presentaba el demandante, se debe deducir que la infección es interna. Bajo estas circunstancias no vemos cómo puede atribuirse error al juez sentenciador al no adoptar los puntos de vista del Dr. Ramos Oller relativos a la relación de causa y efecto entre la inyección aplicada al demandante y el hallazgo de un absceso en su región sacrolumbar, sobre todo cuando evidentemente no

dió crédito al testimonio del demandante sobre la falta de asepsia adecuada al aplicar la misma.

■ El segundo error atribuído al juez sentenciador, consistente en admitir el testimonio de Alberto Velázquez y los de otros testigos que, según estipulación, declararían sustancialmente lo mismo que éste, demostrativos del tratamiento que a ellos había administrado el demandado para la misma dolencia que aquejaba al demandante al ser éste por él examinado, carece de méritos.

El demandado, luego de haber declarado en el interrogatorio directo que había atendido al demandante usando la misma técnica y tratamiento usados en casos anteriores, al ser contrainterrogado por uno de los abogados del demandante declaró extensamente sobre tal técnica y tratamiento y sobre el número de casos que tuvo bajo su atención durante los 10 u 11 años precedentes.

Suponiendo, sin resolver, que el testimonio de Alberto Velázquez y los demás que por estipulación se aceptó declararían lo mismo que éste, fuera inadmisible en evidencia, (¹) dichos testimonios en forma alguna perjudicaron al deman-

(¹) Sobre este extremo así se expresa Wigmore en 1 *Wigmore on Evidence,* 3ra. ed., sección 67, pág. 487:

*Partes en casos civiles: Destreza del demandado en casos de Mala Práctica.* Cuando la acción es una por mala práctica contra un médico u otra persona cuya labor requiere destreza, el hecho de que el demandado posea o no tal destreza es usualmente puesto en duda por la ley y las alegaciones y puede por lo tanto ser probado según el principio establecido en las secciones 70–79, *post.* Pero aparte de esto y presumiendo que la cuestión sea el determinar si él realizó determinado acto de una manera poco diestra o usando métodos incorrectos, parece propio que sus características habituales—de poder éstas ser presentadas en evidencia por su reputación o en otra forma (*post,* secciones 1621, 1987)—sean admisibles como índice de su conducta probable, pues lo que está envuelto es un hábito y entrenamiento y no un rasgo moral y así la regla establecida en las secciones 83, 92 *post* debe aplicarse y no la de reputación (*character rule*). Hay, sin embargo, poca autoridad útil sobre este punto."

Y así se expresa en la sección 83, págs. 512–13:

"*Principio General.* Como indicación de la probabilidad de que una persona realice o no un acto en cuestión, son usualmente de suficiente valor probatorio como para considerarse admisibles en evidencia, su capacidad

dante, pues sin la oposición de éste el demandado declaró sobre tales extremos siendo sometido a un extenso contrainterrogatorio. De otro lado, las conclusiones de hecho del juez sentenciador giran primordialmente alrededor de la propia declaración del demandado y su auxiliar en cuanto a la técnica y tratamiento usados en el caso específico del demandante y en los testimonios de los peritos que ratificaron la corrección de los medios usados en dicho caso, independientemente de los medios que hubiere usado en el tratamiento de otros pacientes.

La imputación de pasión, prejuicio y parcialidad que en su tercer señalamiento de error hace el demandante, no tiene fundamento. La prueba a que dió crédito y que sirve de base a las conclusiones de hecho del juez sentenciador

---

(o no) los métodos o el equipo adecuado para ejecutar tal acto. Las circunstancias específicas de cada caso en particular demuestran si alguno de estos hechos es allí relevante y no hacen falta reglas más específicas ni ha surgido ninguna controversia en cuanto a la admisibilidad de esta clase de evidencia.

"Para excluir la presentación de tales hechos en ciertos casos han mediado consideraciones que afectan otros aspectos de la evidencia con los cuales el uso que estamos discutiendo ha sido confundido. Así, la regla que prohibe el uso del carácter de una de las partes como evidencia (ante, secciones 55, 64) se ha pensado en algunos casos que requiere la exclusión de cierta información que erróneamente se ha identificado con el carácter. Así también la regla contra el uso de actos específicos de conducta impropia de una persona como medio de probar su carácter (post, sección 193), y limitando el uso de tal conducta impropia a ciertas condiciones cuando se quiere demostrar intención (post, sección 300), se ha considerado a veces como que opera en contra del hecho de poseer herramientas criminales u otros medios disponibles. Las cortes están tan conscientes de la impropiedad de usar contra un acusado su carácter o actos específicos de conducta impropia para probar su carácter, que ocasionalmente ignoran la posibilidad de usar evidencia desde el punto de vista bajo discusión, y mediante una errónea interpretación de los propósitos de la evidencia, se sienten obligadas a aplicarle reglas de exclusión que nada tienen que ver con ella. Esto debe tenerse siempre presente como llave para ciertas decisiones que no pueden explicarse de ninguna otra manera y que no deberían imperar como precedentes.

"Como principio general, entonces, la existencia o falta de capacidad física, destreza o medios para ejecutar un acto, son admisibles como alguna evidencia de la posibilidad o probabilidad de que la persona realice o no el acto."

es suficiente para sostener la sentencia. Ésta, por lo tanto, no es contraria a los hechos, como afirma el apelante. Tampoco es contraria a derecho. Un médico sólo viene obligado a dar a su paciente aquella atención médica que generalmente se emplea para casos similares por el resto de los médicos en la comunidad. *Kichner* v. *Dorsey & Dorsey*, 284 N.W. 171 (1939) ; *White* v. *Moore*, 62 S.E. 2d 122 (1950) : *Wilson* v. *Martin Memorial Hospital*, 61 S.E.2d 102 (1950) ; *Problems of Negligent Malpractice*, 26 Virginia L. Rev. 919 (1940).([2]) Es responsable en daños y perjuicios sólo cuando ha actuado negligentemente, con descuido o falta de pericia. En este aspecto un caso de mala práctica no se distingue de un caso. ordinario de daños y perjuicios basado en negligencia.([3]) Existe la presunción, a favor del médico, de que éste utilizó y administró el tratamiento adecuado a su paciente, *Hanners* v. *Salmon*, 288 S.W. 307 (1926), no surgiendo presunción alguna de negligencia del hecho de que el paciente haya sufrido daño o de que su tratamiento no haya tenido éxito. *Derr* v. *Bonney*, 231 P. 2d 637 (1951) ; *Bonnet* v. *Foote*, 107 P. 252 (1910). Tampoco surge inferencia o presunción alguna de negligencia del hecho de haberse desarrollado una infección después de una operación u otro tratamiento. *Tallon* v. *Spellman*, 19 N. E. 2d 33, 35 (1939) ; *Stacy* v. *Williams*, 69 S.W.2d 697 (1934).

■ La negligencia del médico, *per se*, no es suficiente

---

([2]) La regla apuntada es universal en las jurisdicciones americanas. Véanse 41 Am. Jur., *Physicians and Surgeons*, secciones 78 y 82, págs. 197, 198, 200 a 202; 129 A.L.R. 108; 22 Tulane L. Rev. 537 (1948). En los·casos de *Rojas* v. *Maldonado*, 68 D.P.R. 818 (1948) y *Carrasquillo* v: *Am. Missionary Association*, 61 D.P.R. 867 (1943), no estaba envuelta la responsabilidad profesional directa que los hechos de este caso presentan y fueron aplicados otros principios de derecho.

([3]) Las autoridades están en desacuerdo en cuanto a si la causa de acción que ejercita un demandante que alega haber sufrido daños en su tratamiento·es de naturaleza *ex contractu* o *ex delicto*. Véanse 22 Tulane L. Rev. 537; Revista de Derecho Privado, Tomo 11, pág. 143 (1923) ; Eduardo Benzo, *La Responsabilidad Profesional del Médico* (1944), Capí.tulo IV, pág. 107.

para recobrar indemnización. Una vez establecido el hecho que el médico ha sido negligente, hay que establecer—al igual que en los demás casos de negligencia—que esa negligencia fué la causa próxima del daño recibido. *Ewing* v. *Goode*, 78 F. 442 (1897); *Bowles* v. *Bourdon*, 219 S.W.2d 779 (1949); *Newman* v. *Campbell*, 73 P.2d 1265 (1937). Véase asimismo *Proximate Cause in Malpractice Cases*, 13 A.L.R. 2d 11 (1950).(4)

■ La mera posibilidad de que la negligencia de un médico haya sido la causa próxima del daño, no es suficiente para establecer un caso de mala práctica por negligencia contra un demandado; si hay la posibilidad de que otras causas puedan haber intervenido, es deber del demandante excluir éstas, demostrando que la negligencia del médico fué realmente la causa próxima del daño. *Ramberg* v. *Morgan*, 218 N.W. 492 (1928); *Ewing* v. *Goode*, supra; Eduardo Benzo, *La Responsabilidad Profesional del Médico* (1944), pág. 121.

■ En el caso de autos muy lejos quedó el demandante de establecer que el demandado no usó la técnica y el tratamiento generalmente seguidos para la dolencia que le aquejaba cuando le visitó por primera vez. El diagnóstico original fué correcto, según quedó comprobado aun por la propia prueba médica del demandante, quien no estableció elemento alguno de negligencia al hacer su diagnóstico el demandado. Por otro lado, su caso giró alrededor de la teoría de que el absceso fué consecutivo a la inyección caudal aplicádale en dicha ocasión. Sobre este extremo, al igual que sobre la alegada falta de asepsia, hubo conflicto en la prueba, y el juez sentenciador dirimió el conflicto, no creyendo la del demandante de que no hubo asepsia adecuada y, en cuanto a la prueba pericial, estimó que el absceso profundo que requirió intervención quirúrgica en el Hospital

---

(4) La doctrina de *res ipsa loquitur* no es generalmente aplicada en casos de mala práctica. 162 A.L.R. 1265; 26 Virginia L. Rev., supra.

Pavía Fernández no se produjo como consecuencia de infección causada por la alegada falta de asepsia.

*En tales circunstancias, no creemos que se hayan cometido los errores señalados y la sentencia será confirmada.*

El Juez Presidente señor Todd, Jr., no intervino.