LEVIS SÁEZ, demandante y recurrente, *v.* MUNICIPIO DE PONCE, REPRESENTADO POR SU ALCALDE CARLOS JUAN CINTRÓN, demandado y recurrido.

*Número:* 12612 *Resuelto:* 26 de febrero de 1962

536

*Frank Torres,* abogado del recurrente; *Leopoldo Bonilla Vélez,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Se trata de un pleito en reclamación de daños por responsabilidad profesional. (¹)  Una niña de once años de edad que se quejaba de dolor en la garganta fue examinada por un médico interno en el Hospital Tricoche, institución para la beneficencia pública operada por el municipio de Ponce.  Interrogada por éste, la niña le manifestó que sentía dolor de garganta y dolor de cabeza, y que además tenía tos.  El examen

---

(¹) Deliberadamente hemos omitido usar el vocablo "mala práctica", que generalmente lleva la connotación de la existencia de negligencia deliberada o ignorancia crasa del médico.

practicádole reveló que tenía las amígdalas inflamadas y acusaba ronquidos en el pecho, pero no sonidos sibilantes. En presencia de la abuela de la niña, que a la sazón la acompañaba, se le preguntó si en ocasiones anteriores se le había administrado penicilina en inyecciones y la reacción a la misma, "contestando la niña que sí le habían aplicado inyecciones de penicilina, pero nunca había tenido una reacción alérgica a esa droga". No se le hizo prueba alguna adicional para determinar el grado de sensibilidad de la paciente a la droga.

Con el cuadro semiótico descrito y la información reseñada, el interno diagnosticó la dolencia que aquejaba a la niña como una tonsilitis o una bronquitis, y le recetó unas tabletas de aspirina, un expectorante y la administración de penicilina, por la vía intramuscular, para ser aplicada una inyección diaria de 400,000 unidades, por espacio de tres días.

Del dispensario médico—habilitado especialmente para el tratamiento ambulatorio de pacientes que no requieren ser recluidos—la menor pasó a la farmacia del hospital donde le despacharon las inyecciones. Una enfermera le aplicó una inyección en el brazo izquierdo. La menor no permaneció bajo observación. Se retiró, pero apenas habían transcurrido diez minutos, sufrió un colapso en la misma verja del hospital y se desplomó despidiendo espuma por la boca y presentando señales de cianosis. Falleció pocos minutos después.

El tribunal de instancia determinó que "la niña . . . padecía de asma y falleció por asfixia debido a una obstrucción bronquial producida por secreciones espesas y arias [sic] de atelectasia (falta de dilatación pulmonar). La prueba pericial demostró, además, que esta seria obstrucción bronquial fue fatalmente agravada con la aplicación de la inyección de penicilina de 400,000 unidades, la cual produjo en la niña un *shock* (parálisis) o reacción anafiláctica (sensibilidad excesiva a la acción de ciertas substancias alimenticias o medicamentosas) que por sí solo podía producir la muerte casi instantánea [sic] en una paciente asmática." También con-

cluyó que el interno suministró a la infortunada niña "la atención médica generalmente empleada para casos de esta naturaleza por el resto de los médicos de la comunidad", y consideró —acogiéndose a lo resuelto en *Rivera v. Dunscombe*, 73 D.P.R. 819 (1952)—que la parte demandante no podía prevalecer porque de la prueba surgía la posibilidad de otra causa del daño, y se refirió específicamente al testimonio del patólogo Dr. Edwin Rivera, quien practicó la autopsia del cadáver, y que, entre otras cosas, declaró que "las secreciones eran muy espesas y muy abundantes para haberse desarrollado en la fecha de la inyección; que esas secreciones han tenido que producirse antes de aplicarse la inyección y que no encontró ninguna evidencia definitiva que fue la reacción de penicilina." Este galeno expresó que la niña pudo haber muerto el mismo día trágico sin que se le hubiese administrado la penicilina, aunque admitió la posibilidad de que la penicilina hubiera podido producir la muerte.

Se declaró sin lugar la demanda. ■

1 El apelante insiste con gran énfasis en que el municipio demandado debe responder por los daños causados considerando que el doctor que atendió y recetó a la paciente no había sido autorizado para ejercer su profesión en el Hospital Tricoche, ya que el permiso que se le concedió se limitaba a permitirle actuar como médico interno en el Hospital de Distrito de Bayamón.(2) El permiso de internado rezaba además que "El Dr. . . . no podrá ejercer la profesión médica libremente en Puerto Rico, y solo se circunscribirá a hacerlo dentro de los límites de la institución mencionada, bajo la su-

(2) Para la fecha de los hechos relatados en la demanda—11 de junio de 1956—el mencionado médico no estaba autorizado a ejercer la medicina en ningún lugar de Puerto Rico. El permiso a que hemos hecho referencia, aunque expedido en 11 de mayo de 1956, entró en vigor en 1 de julio del mismo año. Había disfrutado de otro permiso para trabajar en la Clínica Dr. Pila, de Ponce, por el período comprendido entre el 17 de julio de 1954 y el 16 de julio de 1955. Sin embargo, este hecho no altera en forma alguna el resultado del pleito, ya que la norma de derecho aplicable es la misma ·trátese de una persona que ejerce sin licencia, o con una licencia limitada a determinada localidad.

pervisión inmediata del médico director de la misma". La doctrina imperante es al efecto de que la omisión de obtener una licencia según requerido por las leyes locales regulando el ejercicio y práctica de la medicina[3] no constituye fundamento para una acción en daños por la negligencia o impericia del médico, en ausencia de una demostración de casualidad entre el daño y la falta de licencia. *Brown* v. *Guy*, 301 P.2d 413, 418 (Cal. 1956); *Andrews* v. *Lofton*, 57 S. E.2d 338 (Ga. 1950); *Grier* v. *Phillips*, 55 S. E.2d 485 (S.C. 1949); Anotación, *Liability to patient for results of medical or surgical treatment by one not licensed as required by law*, 44 A.L.R. 1418 (1926), suplementada en 57 A.L.R. 978 (1928). Nos parece conveniente reproducir unos párrafos de la opinión emitida por el Juez Asociado señor Franco Soto en *Maldonado* v. *Hamilton*, 32 D.P.R. 225, 236–237 (1923), al referirse a la falta de licencia para conducir vehículos de motor como índice de negligencia:[4]

"¿Qué hecho o circunstancias demuestran la relación causal entre la omisión del demandado por su carencia de licencia y la muerte de Maldonado? La razón que nos da el apelado es que si dicho demandado hubiera obtenido su licencia hubiera recibido una copia de la Ley núm. 75 y actuado de acuerdo con sus disposiciones. Pero un razonamiento en tal forma no tendría más valor que una cuestión de principio y nos podía conducir al absurdo de que el mero hecho de tener licencia podía considerarse *a sensu contrario* como una presunción concluyente de haberse actuado con la debida diligencia cualquiera que fuera la forma en que ocurriera un accidente. Ni uno ni otro extremo presentan una buena doctrina, pues así como la mera tenencia de una licencia para guiar un automóvil no hace inmune al que causa un daño en caso de accidente, el hecho contrario, por falta de licencia, no implicaría por sí solo negligencia y sí más bien negligencia *prima facie,* sujeta a prueba en contrario o a las resultas de los

---

[3] Véanse los artículos 9, 14 y especialmente el 17—sobre licencia especial para internos—de la Ley núm. 22 de 22 de abril de 1931, 20 L.P.R.A., secs. 39, 43 y 46.

[4] Véanse, además, *Vélez* v. *Font*, 35 D.P.R. 312 (1926); *Pueblo* v. *Pereira*, 49 D.P.R. 891 (1936); *cf. Usera* v. *González*, 74 D.P.R. 487, 489 (1953).

demás hechos o inferencias que puedan demostrar la relación causal de la falta de licencia y el accidente." ■

Como se indica en *Brown* v. *Shyne*, 151 N.E. 197 (N. Y. 1926), el factor a determinarse es si la obtención de la licencia hubiera evitado el daño. En *Rivera* v. *Dunscombe*, 73 D.P.R. 819, 838 (1952) delineamos los contornos de esta acción de daños al decir que "[un médico] Es responsable en daños y perjuicios sólo cuando ha actuado negligentemente, con descuido o falta de pericia. En este aspecto un caso de mala práctica no se distingue de un caso ordinario de daños y perjuicios basado en negligencia." ■

Por otro lado, aun cuando el interno que recetó la administración de la inyección de penicilina hubiere sido negligente, este hecho por sí solo no prueba que el hospital demandado fuera negligente al seleccionarlo. *Sandone* v. *Dallas Osteopathic Hospital*, 331 S.W.2d 476, 480 (Texas 1959); *Parowski* v. *Bridgeport Hospital*, 134 A.2d 834 (Conn. 1957); *Steele* v. *St. Joseph's Hospital*, 60 S.W.2d 1083, 1087 (Texas 1933). Véase, *Vicarious Liability of Hospitals*, 44 Marq. L. Rev. 153 (1961). ■

2 Para que pueda prosperar una acción para exigir responsabilidad profesional fundada en la administración de una droga a la cual el paciente es alérgico o hipersensible es preciso establecer que el médico tenía conocimiento de esta condición anafiláctica, *Yorston* v. *Pennell*, 153 A.2d 255 (Pa. 1959); *Horace* v. *Wayrauch*, 324 P.2d 666 (Cal. 1958); *Stocker* v. *Dailey*, 85 N.W.2d 745 (N.D. 1957); y 97 N.W.2d 676 (N.D. 1959); *Parrish* v. *Clark*, 145 So. 848 (Fla. 1933); *Neely* v. *St. Francis Hospital and School of Nursing*, 363 P.2d 438 (Kan. 1961); Lousell y Williams, *Trial of Medical Malpractice Cases*, 1960, sec. 4.11, pág. 127. En *Rotan* v. *Greenbaum*, 273 F.2d 830 (C.A. D.C. 1959) se impuso responsabilidad a un médico que administró una inyección de 600,000 unidades de penicilina a una paciente, a quien le sobrevino la muerte quince minutos después debido a una pa-

542

rálisis de origen anafiláctico. A pesar de que los hechos son similares, la falta de pericia consistió en formular una terapéutica inapropiada para paperas, que era la enfermedad que padecía la paciente. En el presente caso no se ha insinuado siquiera que la administración de penicilina no fuera el tratamiento indicado para los síntomas que presentaba la menor al ser examinada. En cuanto al conocimiento de la condición anafiláctica el tribunal *a quo* determinó que se había observado la práctica imperante en la comunidad que se limita a inquirir del paciente si en ocasiones anteriores la droga mencionada le ha causado alguna reacción.(5) Dirimió así el conflicto de la prueba. Un examen de la transcripción sostiene esta conclusión.

(5) Generalmente la responsabilidad del médico se determina por la observancia de la atención que generalmente se emplea para casos similares por el resto de los médicos en la comunidad, *Rivera* v. *Dunscombe*, supra, pág. 838; 6 U. of Pitt. L. Rev. 113 (1940); Nathan, *Medical Negligence* (1957), págs. 19–36. Esta norma de cuidado y atención es una cuestión de hecho que requiere generalmente prueba pericial, *Di Filippo* v. *Preston*, 173 A.2d 333 (Del. 1961); *Cooper* v. *Providence Hospital*, 130 So.2d 8 (Ala. 1961); *Marsh* v. *Pemberton*, 347 P.2d 1108 (Utah, 1959); cf. *Richison* v. *Nunn*, 340 P.2d 793 (Wash. 1959); comentario, 30 Temple L. Q. 448 (1957). El perito presentado por el demandante aceptó que la práctica seguida por el médico interno era la que se seguía generalmente en Ponce.

En cuanto a hospitales, hemos resuelto que el cuidado y atención debidos a un paciente han de ser razonables, y que se miden por "normas de razonabilidad y prudencia". Y añadimos que "(1)as prácticas prevalecientes en la comunidad pueden servir de índice". *Hernández* v. *Capital*, 81 D.P.R. 1031, 1038 (1960).

Aunque no está específicamente envuelto en el presente caso, creemos conveniente indicar que esta norma sobre la observancia de la práctica o tratamiento en la comunidad ha evolucionado con el adelanto en los medios de comunicación y las mayores facilidades para el médico mantenerse debidamente informado de los últimos adelantos científicos. El concepto de comunidad tampoco se limita a determinada población, sino que entra en juego el factor de accesibilidad a un mejor tratamiento. Véanse, *Gist* v. *Franch*, 288 P.2d 1003 (Cal. 1955); *Tvadt* v. *Haugen*, 294 N.W. 183, 188 (1940). Consideraciones de especialización pueden también requerir un distinto grado de cuidado ante la misma situación. *Carbone* v. *Warburton*, 91 A.2d 518 (N. J. 1952). Para una discusión amplia de la responsabilidad del médico; véase, McCoid, *The Care Required of Medical Practitioners*, 12 Vand. L. Rev. 549–632 (1959).

3 En *Rivera* v. *Dunscombe*, supra, a la pág. 839, dijimos que "La mera posibilidad de que la negligencia de un médico haya sido la causa próxima del daño, no es suficiente para establecer un caso de mala práctica por negligencia contra un demandado; si hay la posibilidad de que otras causas puedan haber intervenido, es deber del demandante excluir éstas, demostrando que la negligencia del médico fue realmente la causa próxima del daño . . ." Según expresamos anteriormente, una acción para exigir responsabilidad profesional no es distinta de un caso ordinario de daños y perjuicios por negligencia. Todo cuanto se requiere es que la parte demandante establezca por la preponderancia de la evidencia—creída por el juzgador—que el daño emergente fue causado por los actos de negligencia, falta de cuidado o impericia del médico. Existe la presunción, *en ausencia de evidencia en contrario*, que se ha ejercitado un grado de cuidado razonable y de que se administró el tratamiento adecuado al paciente. Corresponde al demandante presentar evidencia suficiente para controvertir esta presunción y para ello la prueba debe demostrar que existe algo más que una mera *posibilidad* de que el daño se debiera al incumplimiento por el médico de su obligación. Se requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura, *Johnson* v. *Ely*, 205 S.W.2d 759 (Tenn. 1947); *Lanier* v. *Trammell*, 180 S.W.2d 818, 824 (Ark. 1944); sino por la preponderancia de la evidencia, *Demchuk* v. *Bralow*, 170 A.2d 868 (Pa. 1961); *Atkins* v. *Humes*, 107 So.2d 253 (Fla. 1958); *Soest* v. *Balsinger*, 141 P.2d 927 (Cal. 1943); *Sansom* v. *Roos-Loos Medical Group*, 134 P.2d 927 (Cal. 1943); *Lohr* v. *Watson*, 2 N.W2d 6, 8 (S.D. 1942); o sea, que el daño se ha debido con mayores probabilidades a la negligencia que el demandante imputa. *Crewse* v. *Munroe*, 355 P.2d 637 (Ore. 1960); *Thompson* v. *Lillehei*, 164 F. Supp. 716 (Minn. 1958); cf. *Steele* v. *Woods*, 327 S.W2d 187 (Mo. 1959). No puede exigírsele a este respecto que elimine toda otra posible causa

del daño.([6])  *Christie* v. *Callahn,* 124 F.2d 825, 840 (C.C.A. D.C. 1941) ; *Barham* v. *Widing,* 291 P. 173, 177 (Cal. 1930) ; *Boles* v. *Hotel Maytag Co.,* 253 N.W. 515, 517 (Iowa 1934). Si la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad al médico a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades lo causó.([7]) *Ritter* v. *Sivils,* 293 P.2d 211 (Ore. 1956) ; *Heinlich* v. *Harvey,* 39 N.W.2d 394 (Wis. 1949) ; *Woronka* v. *Sewall,* 69 N.E.2d 581 (Mass. 1946) ; *Anderson* v. *Nixon,* 139 P.2d 216, 220 (Utah 1943).  Véase, Anotación, *Proximate cause in malpractice cases,* 13 A.L.R.2d 11 (1950).

---

([6]) Si exigiéramos que se eliminara toda otra *posibilidad* como causante del daño, sería muy difícil el éxito de un demandante, considerando que la medicina no es una ciencia exacta y que la certeza absoluta es rara vez posible.  Por otro lado no puede ignorarse el espíritu de solidaridad tribal que prevalece entre los miembros de la clase médica, que se manifiesta en una abierta renuencia a prestar testimonio como peritos de los reclamantes. Véase, O'Hara, *The Reasons for the Reluctance of Physicians to Testify,* 2 Vill. L. Rev. 101–105 (1956) ; *Coercion by a Medical Association to Preclude Availability of Expert Testimony in a Medical Malpractice Action,* 58 Mich. L. Rev. 802 (1960).  A no poco han contribuido a esta actitud las prácticas de muchos miembros de la profesión legal, tan dispuestos a iniciar un pleito contra un médico, sin la debida consideración de las probalidades de éxito, poniendo así en tela de juicio la buena reputación del demandado, aunque sea temporalmente.  Wade, *Public Responsibilities of the Learned Professions,* 21 La. L. Rev. 130 (1960).  Además, conocida es la práctica de compañías aseguradoras que cancelan las pólizas de los médicos que prestan testimonio a favor de los demandantes.  Ciertamente, no son estas organizaciones las mejores guardadoras de la moral y conciencia de un médico.

([7]) En cuanto a la existencia de una presunción de negligencia en casos de médicos y hospitales, véanse, Louisell y Williams, *Trial of Medical Malpractice Cases* (1960), § 14.01—14.09, págs. 418–460;  Anotaciones en 68 A.L.R.2d 426 (1959) ;  58 A.L.R.2d 216 (1958) ;  54 A.L.R.2d 208 (1957) ; 53 A.L.R.2d 142 (1957) ;  51 A.L.R.2d 970, 973 (1957) ;  41 A.L.R.2d 329, 355 (1955) ;  29 A.L.R.2d 504 (1953) ;  162 A.L.R. 1265 (1946) ;  152 A.L.R. 638 (1944) ;  141 A.L.R. 111, 158 (1942) ;  65 A.L.R. 1023, 1031 (1930). Véanse, además, Louisell y Williams, *Res Ipsa Loquitur—Its Future in Medical Malpractice Cases,* 48 Cal. L. Rev. 252 (1960) ; Mackey, *Res Ipsa Loquitur in Malpractice Cases, the Superior Knowledge Factor,* 9 Hast. L. Rev. 322 (1958).

Pero aun cuando aplicáramos la norma discutida en el párrafo anterior al presente caso, tendríamos siempre que considerar que según la determinación de los hechos del tribunal de instancia el único hecho de recetar la inyección de penicilina no constituiría negligencia, en ausencia de prueba de que el médico tenía conocimiento de la condición de hipersensibilidad de la menor.(8)   Por otro lado, ya se estableció que se siguió el tratamiento utilizado generalmente en la comunidad.   ▆▆▆

Finalmente, el apelante insiste en que se incurrió en negligencia al permitir que la menor abandonara el hospital inmediatamente después de ponérsele la inyección, y en no haberla retenido para observación.   No se estableció claramente cual es la práctica existente en la comunidad, y de la transcripción sólo surge una referencia a que constituye una buena práctica observada al paciente, pero no es necesario hacerlo (T.E., pág. 116), y que generalmente cuando se está tratando a muchos pacientes, se les despacha tan pronto se les administra la inyección (id. 11, pág. 117).   Tampoco se presentó prueba alguna sobre las posibilidades de sobrevivir un choque anafiláctico.   De las lecturas científicas que hemos hecho acuciados por la curiosidad—véanse las obras y artículos citados en el escolio 8—deducimos que aunque ello es posible, es altamente improbable, especialmente cuando se trata de la administración por la vía intramuscular.(9)

---

(8) En relación con las reacciones anafilácticas por administración de penicilina, véanse, Hussar y Holley, *Antibiotics and Antibiotic Therapy* (The Macmillan Company, 1954), págs. 62–68; Mayer y otros, *Penicillin Anaphylaxis*, 151 J.A.M.A. 351 (1953); Feinberg y otros, *Penicillin Anaphylaxis, Non Fatal and Fatal Reactions,* 152 J.A.M.A. 114 (1953); Fraser, *Immediate Anaphylactic Shock from Oral Penicillin,* 2 M.J. Austr. 801 (1958); Miller, *Anaphylactoid Reaction to Oral Penicillin,* 11 U.S.A.F. Med. J. 451 (1960); Martínez Cortés, *La Alergia a la Penicilina,* Gaceta Médica de Méjico, tomo 90, pág. 991 (1960).

(9) En casos de choque anafilácticos producidos por penicilina administrada por la vía oral, el uso de adrenalina (epinefrina) y antihistamínicos ha logrado salvar al paciente.   También se recomienda el uso de aminofilina por la vía intravenosa.

No es necesario discutir las otras cuestiones planteadas por el apelante en vista de que no se estableció la negligencia del empleado de la parte demandada.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 7 de noviembre de 1957.*

El Juez Asociado señor Santana Becerra concurre en el resultado.