WILLIAM PÉREZ y HAYDEÉ COSME, demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrido.

*Número:* R-63-205     *Resuelto:* 21 de febrero de 1968

*Ángel Manuel Ciordia* y *Valentín Polanco de Jesús,* abogados de los recurrentes; *J. B. Fernández Badillo, Procurador Gene-*

*ral, J. F. Rodríguez Rivera, Procurador General Interino,* y *Peter Ortiz, Procurador General Auxiliar,* abogados del recurrido.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Éste es un caso de daños y perjuicios por negligencia e impericia profesional médica.

Los hechos pueden resumirse como sigue. El 14 de agosto de 1961, en su casa sita en las Parcelas del Barrio Frontón en Ciales, la madre de la niña Almida Pérez Cosme de trece meses de edad, encontró a ésta en el piso de la cocina con síntomas de estar ahogada. En el piso había unas habichuelas regadas.

La niña fue llevada al Centro de Salud de Ciales en donde la vio el Dr. Arturo E. Sanabria, quien luego de examinarla la refirió al Hospital de Distrito de Arecibo. Sobre el particular el Dr. Sanabria declaró en el juicio:

"Esa niña me la trajeron al Hospital Municipal de Ciales a eso de las diez de la mañana y traía un cuadro de estar ahogada, tratando de vomitar y tosía a la misma vez. Hacía muchos reflejos para vomitar y botaba como una mucosidad blanca cada vez que hacía por vomitar. A la niña entonces le examiné la faringe en busca de que le ocasionaba esto y no pude encontrar anormalidad alguna hasta donde la visión me cubría, pero continuaba con los síntomas de estar ahogada con algo, como un cuerpo extraño. Le referí el caso al Hospital de Distrito de Arecibo donde hay más facilidades para ver estos casos de remover cuerpos extraños de sitios donde se alojan."

En la Solicitud de Admisión al Hospital el Dr. Sanabria escribió lo siguiente:

"Esta niña aparentemente se ha tragado un objeto duro y está en dificultades. Como se ha tragado un cuerpo extraño tiene náuseas constantemente y tose como tratando de vomitar. Al examinarla no he encontrado anormalidad alguna en la faringe.

Diagnóstico tentativo: Examínese para cuerpo extraño en el esófago. Recomendación (hospitalización o dispensario) lo que decida el doctor a cargo de admisiones." (¹)

Ese mismo día 14 de agosto y en virtud de la recomendación del Dr. Sanabria la niña fue llevada al Hospital de Distrito de Arecibo. Allí la vio el Dr. Jesús Rodríguez García, quien firmó el Informe de Accidente y el Récord de Admisión. En el Informe de Accidente se escribió que "Supone la mamá que se tragó algo." En el Récord de Admisión el doctor escribió "La madre alega que la niña se tragó un alfiler."

El doctor ordenó que le tomasen placas de rayos X. Se las tomaron y el informe del radiólogo dice "Negativo en cuanto a cuerpo extraño" ("Negative for foreign body"). (²) El Dr. Rodríguez García envió la niña a su casa y así lo hizo constar en el Informe de Admisión, el cual firmó. (³)

La madre y la niña llegaron a su casa como a las 5:30 de la tarde. La madre, Haydeé Cosme, declaró que la niña se asfixiaba y trataba de vomitar; que durante la noche se puso negra y sin respiración; que al verla así como a medianoche la llevó al Dr. Alberto Geyls Ramírez, médico de práctica privada en Ciales. El Dr. Geyls recomendó a la Sra. Pérez que llevara a la niña al Hospital de Distrito de Arecibo. (⁴)

La Sra. Pérez declaró que llegó al hospital como a la 1:15 de la madrugada del 15 de agosto. Allí la niña fue

---

(¹) Lo anteriormente citado es una traducción del inglés.

(²) Aparentemente la expresión utilizada en el informe del radiólogo fue errónea. El informe debió ser rayos X, negativo o negativo en cuanto a cuerpo extraño que retratase en la placa, pues difícilmente el radiólogo podía saber si había o no un cuerpo extraño que no retratase, como la habichuela en este caso, o un pedazo de fruta, o un pedazo de carne, etc.

(³) En el Informe de Admisión el Dr. Rodríguez García hizo el siguiente diagnóstico: "No. app. pathology. Treatment recommended: Flat on Abd."

(⁴) El Dr. Geyls en su informe, el cual fue llevado por la Sra. Pérez al Hospital de Distrito, escribió lo siguiente:

"This patient was seen there because of history of ingestion of a foreign body. This evening baby developed disnea, cyanosis and respiratory distress. She is referred for observation. Impression Foreign Body."

vista por el Dr. Néstor A. Rivera. La Sra. Pérez declaró que este doctor le examinó los oídos, la boca y la nariz; que le dijo que la niña no tenía nada y que se la volviese a llevar para su casa. Declaró que ella le dijo al doctor que la niña estaba grave y que continuaba asfixiada. El Dr. Néstor A. Rivera firmó el récord de admisión en el Hospital de Distrito de Arecibo ese día a la 1:30 A.M. Escribió en dicho informe "La madre alega que la niña se ha tragado algo." Como diagnóstico provisional dictaminó "Cuerpo Extraño" ("Foreign Body"). En cuanto a tratamiento escribió "Rayos X negativo. Enviada a su casa."

En su casa la niña siguió con los mismos síntomas. El 17 de agosto la llevó adonde el Dr. Mudafort, médico de práctica privada en Manatí, quien le recetó una medicina para tomar. La niña continuó con los mismos síntomas y el día 22 la madre acudió a la cuna a verla donde "estaba gritando y estaba negra." Ese día la niña falleció.

El Dr. José A. Carro Umpierre, patólogo que practicó la autopsia, declaró que al abrir la tráquea encontró "una habichuela de un color rosado y que medía alrededor de un centímetro y medio de largo y medio centímetro de ancho, que estaba pegada a la bifurcación traqueal, hinchada, y cuya cutícula estaba arrugada, rodeada de mucha secreción en la tráquea y los bronquios." El patólogo explicó que debido a las secreciones se fueron tapando los bronquios y que la habichuela se pegó en la bifurcación traqueal causando la asfixia.

El Tribunal Superior concluyó que no había encontrado en la prueba acto u omisión por parte del demandado que indicase negligencia y declaró sin lugar la demanda.

Los recurrentes señalan los siguientes dos errores:

(1) "El Tribunal Recurrido cometió grave y manifiesto error al resolver el caso exonerando de negligencia por descuido o falta de pericia, a los doctores Jesús Rodríguez García y

Nestor Antonio Rivera que intervinieron con la niñita en el Hospital de Distrito de Arecibo."

(2) "El Tribunal Recurrido cometió grave y manifiesto error al no concluir que el (1) no habérsele hecho a la niñita un examen y diagnóstico adecuado en las dos veces que fue llevada al Hospital de Distrito, (2) no haberse recluído a la menor en el Hospital para observación; (3) no habérsele hecho a la niñita una broncoscopía el primer día en que fue llevada al Hospital al resultar negativa la placa de rayos X, y—con mayor obligación—en la segunda vez que fue llevada al Hospital; (4) devolverla a su casa el Dr. Néstor Antonio Rivera a pesar el historial de la niñita y de su propio diagnóstico provisional de tener un cuerpo extraño ("foreign body"), o (5) no haber referido el caso a un especialista en esas vías, constituyen—conjunta y separadamente—actos de negligencia y descuido o impericia que causaron la muerte por asfixia de la niñita."

Los demandantes tienen razón. Nos parece razonable lo declarado por el Dr. Sanabria en el juicio. Al serle preguntado si creía que la atención que recibió la paciente en el Hospital de Distrito fue "razonable y suficiente" respondió "No señor" y al preguntársele que por qué creía eso dijo:

"Porque yo creo que debió haberse examinado la faringe por dentro, hacia donde está la tráquea y la laringe. Se debió examinar para eliminar la posibilidad de cualquier cuerpo extraño allí, porque los reflejos que la niña tenía indicaban que estaba ahogada."

También declaró el Dr. Sanabria que en ese caso la toma de la placa de rayos X no era suficiente y explicó:

"Porque si estaba esa niña con una obstrucción en la respiración por un cuerpo extraño que no era opaco a los rayos X, la placa salía negativa. Sin embargo, seguía la obstrucción sin averiguarse. Es decir, que del examen que uno hace si no se visualizaba, con los instrumentos se buscaba donde estaba la obstrucción."

Al preguntársele específicamente si creía que la atención que el Dr. Rivera le dio a la niña fue suficiente el Dr. Sanabria contestó que no y explicó:

"La menor seguía con el mismo cuadro clínico que yo la había enviado más el trastorno respiratorio que desarrolló después de cianosis y dyspnea, y el mismo médico, el doctor Rivera, pone en el diagnóstico provisional 'foreign body', o sea, 'cuerpo extraño'. Todavía no se elimina esa posibilidad con el examen que él le practicó."

Al declarar sin lugar una moción para desestimar el tribunal de instancia hizo el siguiente resumen:

"La parte demandante, en la parte del testimonio del doctor Sanabria, trajo ante la consideración del tribunal la cuestión sobre la forma como los doctores Rivera y Rodríguez habían bregado con el asunto de acuerdo con el informe. El recuerdo del tribunal es que, aceptada la capacidad del doctor Sanabria, éste declaró que lo recomendado en este caso era que se hiciera un examen interno de la persona recluída, que no solo debía limitarse a los rayos X, sino con el equipo instalado en el Hospital de Distrito realizar excursiones internas de la persona enferma y hacer búsqueda de cualquier objeto extraño que era el diagnóstico que en todo tiempo se aceptó que era el indicado. Hay una *scintilla* de prueba necesaria, por lo que se declara sin lugar la moción de non-suit." [5]

Las declaraciones del Dr. Sanabria en cuanto a la práctica adecuada y prevaleciente en casos como el de autos no fueron controvertidas por el demandado.

Como hemos visto, en un caso como éste, en que el paciente es referido por segunda vez al hospital con síntomas que demostraban una seria dificultad para respirar no bastaba con darse por satisfecho por el resultado negativo de rayos X, pues los síntomas y el sufrimiento continuaban. La placa de rayos X no era suficiente porque si la obstrucción era causada por un cuerpo extraño que no fuese opaco a los rayos X la placa salía negativa. Como declaró el Dr. Sanabria, debió haberse examinado la faringe hasta la

---

[5] Como se sabe, aun si existe una *scintilla* de evidencia, si el tribunal no le da crédito puede desestimar. Regla 39.2 de Procedimiento Civil; *Irizarry* v. *A.F.F.*, 93 D.P.R. 416 (1966).

tráquea para eliminar la posibilidad de que allí hubiese cualquier cuerpo extraño, ya que los reflejos de la niña indicaban que estaba ahogada. Mucho menos bastaba con devolver la niña a su casa por segunda vez.

■ En Hayt & Hayt, *Legal Aspects of Medical Records* (1964), se expresa a la pág. 329:

"El médico que acepta un paciente debe ir más allá de un examen del mismo. Si el historial y los síntomas sugieren más de un diagnóstico, es su deber hacer diagnósticos diversos ('differential diagnosis') y emprender un proceso de eliminación mediante los exámenes conocidos y prevalecientes en la profesión."

Es razonable concluir que de haberse seguido ese procedimiento básico arriba descrito se hubiese descubierto el grano de habichuela que estaba en la tráquea de la niña y que se le hubiese salvado la vida y de la tortura por la que tiene que haber pasado durante esos días antes de morir asfixiada.

Como dijimos en *Guzmán* v. *Silén*, 86 D.P.R. 532, 538 (1962):

"Como regla general debe ser parte de las normas de cuidado y destreza requeridas por la ley a los profesionales que se dedican a la práctica general de la medicina y la cirugía el que si descubren o deben saber o descubrir que la dolencia del paciente rebasa sus conocimientos, pericia, habilidad o capacidad para tratarlo con razonable oportunidad de éxito, está en el deber de informarlo así al paciente o de aconsejarle de la necesidad de que se someta a otro o a un tratamiento diferente."

Los principios que hemos expuesto aplican con mayor fuerza al segundo médico que examinó la niña en el Hospital de Distrito en la madrugada del 15 de agosto toda vez que ya tenía el beneficio de un historial clínico persistente con síntomas que indicaban la probabilidad de que hubiese un cuerpo extraño en la tráquea de la niña, y que debía suponer que ese cuerpo extraño no era metálico pues no salía en las

placas de rayos X. Esas circunstancias le debieron sugerir que, según la práctica profesional conocida, era necesario hacer un examen con instrumentos especializados, probablemente por un especialista. La paciente no estaba en un dispensario rural en algún lugar remoto en donde fuese materialmente imposible atenderla debidamente. La paciente estaba en el Hospital de Distrito de Arecibo y no se nos ha demostrado que allí no hubiese los instrumentos ni que allí fuese imposible hacerle el examen que correspondía hacer. Por el contrario, podemos y debemos presumir que los había y que era posible conseguir el especialista. Ese segundo examen ocurrió el 15 de agosto y la niña vivió hasta el 22. La niña le dio la oportunidad a los médicos; los médicos no se la dieron a ella.

El Dr. Sanabria, quien hizo su internado en el propio Hospital de Distrito de Arecibo, declaró que allí hay las facilidades para atender un caso como el de autos. Declaró que aquel hospital tiene servicio de especialistas en nariz, ojos y garganta y que los especialistas tienen los instrumentos "para visualizar la faringe por dentro y la tráquea, visualizar los bronquios y el esófago. . . ."

En 6 *Lawyer's Medical Cyclopedia* 78 (1961) se dice sobre el particular:

"Había una gran necesidad de instrumentos para la remoción de cuerpos extraños de la tráquea, los pulmones y el esófago. Muchos de esos instrumentos fueron creados por el Dr. Jackson y por otros, y ahora puede decirse que casi cualquier cuerpo extraño que se introduzca por la boca y que se aloje en el esófago o en el árbol traqueo-bronquial puede ser extraído con éxito por la boca."

El informe del patólogo demuestra que la asfixia fue la causa física directa de la muerte de la niña. Las circunstancias de este caso nos hacen concluir que la causa legal de la muerte fue la negligencia o la negligencia e impericia, de los médicos del demandado. La presunción con-

trovertible en el sentido de que el facultativo ejerció el debido cuidado y que administró el tratamiento adecuado quedó controvertida por la prueba.(6) La práctica profesional de la comunidad, o prevaleciente·en la comunidad, cuando ese término se usa como norma ("standard") contra la cual medir el cuidado ejercido y el tratamiento administrado en un caso específico, no quiere decir la práctica pobre sino la práctica que llena las exigencias profesionales reconocidas, o sea, la práctica aceptable profesionalmente hablando, en determinado lugar y tiempo.(7)

*Se revocará la sentencia del Tribunal Superior, Sala de Arecibo, dictada en este caso en 9 de agosto de 1963 y se dictará una declarando con lugar la demanda y condenando al demandado a pagar a los demandantes, William Pérez y Haydeé Cosme, padres de la niña fallecida, la suma de quince mil dólares más las costas.*(8)

---

(6) *Sáez* v. *Municipio de Ponce,* 84 D.P.R. 535, 543 (1962); *Rivera* v. *Dunscombe,* 73 D.P.R. 819, 838 (1952).

(7) El Dr. Arturo E. Sanabria merece el reconocimiento del ·Tribunal por ayudar a esclarecer los hechos en este caso.

(8) En esta acción el único demandado es el Estado Libre Asociado. En *Carrasquillo* v. *American Missionary Assn.,* 61 D.P.R. 867 (1943), se condenaron al hospital y al médico a pagar daños. Allí ambos fueron demandados.