CALIXTA EMMANUELLI VDA. DE TORRES, demandante y recurrente, *v.* CAREY C. WOMBLE y ST. LUKE MEMORIAL HOSPITAL, demandados y recurridos.

*Número:* R-68-8     *Resuelto:* 27 de abril de 1971

*Carlos J. Irizarry Yunqué* y *Práxedes Álvarez Leandri,* abogados de la recurrente; *Rivera Zayas, Rivera Cestero & Rúa, Rodolfo Cruz Contreras* y *Adrián Mercado,* abogados de Carey C. Womble; *Martín, Amadeo & Benet,* abogados de St. Luke Memorial Hospital.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

La cuestión planteada en este caso es si los recurridos deben ser responsabilizados por los daños sufridos por la recurrente con motivo de una complicación de fístula al ser sometida a una histerectomía. Bajo las circunstancias de este caso, relacionadas a continuación, concluimos que no, y por lo tanto, confirmamos el dictamen del tribunal de instancia.

El médico cirujano recurrido, Dr. Carey C. Womble, practicó una histerectomía en la persona de la recurrente en 17 de octubre de 1963 en el hospital recurrido con motivo de habérsele desarrollado un carcinoma "in situ" (lesión maligna temprana) en el cuello de la matriz. El tribunal de instancia concluyó que:

"Calixta fue dada de alta el 26 de octubre y se le dio cita para el primero de noviembre de 1963 cuando ella regresó donde Womble y le hizo constar que estaba perdiendo la orina constantemente por la vagina y en tales cantidades que tenía que usar una toalla para protegerse.

El Dr. Womble le informó a Calixta que se trataba de una complicación de la operación, que tenía que volver a hospitalizarse para nuevos exámenes y consultar a un urólogo.

El 5 de noviembre de 1963, volvió al Hospital San Lucas y Womble llamó al Dr. Gilberto Rodríguez, quien examinó a Calixta y encontró que tenía una fístula vesicovaginal. El 16 de noviembre de 1963, fue dada de alta de este tercer ingreso, acordando Womble y el Dr. Rodríguez que Calixta seguiría bajo tratamiento para las complicaciones urológicas con el último.

La fístula vesicovaginal es un roto en la vejiga conectando con la vagina que permite que la orina fluya de la vejiga a la vagina. En casos como éste, la fístula puede desarrollarse por la perforación de la vejiga durante la operación o por necrosis causada por los tejidos que se mueren.

Del expediente clínico, así como de la prueba pericial, no hay duda que la fístula se produjo como consecuencia de la operación que le hiciera el Dr. Womble a Calixta, pero no creemos que se tratara de una perforación durante la intervención y sí por necrosis causada por los tejidos que se murieron que es una complicación dentro de la operación que no significa necesariamente que hubo descuido o negligencia en la misma. Los peritos discrepan en cuanto a la causa de la fístula. La histerectomía abdominal que se practicó fue una operación complicada, de cuatro horas, donde encontraron quistes ováricos con adherencias. La paciente sangró bastante lo que oscurecía el campo operatorio.

.    .    .    .    .    .    .    .

El 27 de enero de 1964, Calixta fue asilada en el Hospital de Damas para ser operada para la corrección de la fístula. El 31 de enero, el Dr. Rodríguez la operó y permaneció en dicho hospital hasta el 27 de febrero. La fístula fue cerrada en esa ocasión.

Después de esta última operación siguió el flujo de orina por la uretra y tuvo que volverse a asilar en Damas, del 22 al

28 de junio de 1964, para exámenes con el ginecólogo, Dr. Edgardo Yordán, y por el propio Dr. Rodríguez.

El 6 de enero de 1965, Calixta volvió a hospitalizarse en Damas para ser operada el 7, ya que le continuaba la incontinencia de orina. Se le corrigió mediante cirugía una condición de uretrocelia preexistente al 17 de octubre de 1963, y se dio de alta el 27 de enero de 1965.

El 27 de marzo de 1966, fue ingresada en Damas hasta el 29 de dicho mes, debido a frecuentes dolores en la parte baja del abdomen. Se le encontró una hernia incisional, es decir, una hernia en el lugar de una de las operaciones, la que requiere una intervención quirúrgica adicional.

Las molestias de tener que usar constantemente, por casi cuatro meses, un tubo de goma con una botella para recoger la orina de las sondas, el mal olor, las operaciones a que fue sometida, ocasionaron a Calixta Emmanuelli viuda de Torres grandes sufrimientos y angustias mentales.

Calixta ha incurrido en gastos, no cubiertos por seguro médico y de hospitalización, en la suma de $649.78.

No encontramos que del expediente clínico correspondiente a la operación del 17 de octubre de 1963 surja que el Dr. Carey C. Womble fuera descuidado o negligente en la intervención quirúrgica. La fístula vesicovaginal es una complicación de la operación que no necesariamente demuestra que mediara descuido o negligencia del médico. No consideramos, ni en la vista del caso ni ahora, que hubiera algo sospechoso en el expediente clínico a que nos hemos referido [el de la histerectomía] y lo único que preocupó al Tribunal sobre el historial de la operación del 17 de octubre, fue adecuadamente aclarado sin que quedaran dudas en la mente juzgadora de cuál era el verdadero historial, o sea, el que aparece en copia fotostática, cuyo original no está unido al expediente."

Basado en que (1) la prueba de la recurrente no demostró clara y definitivamente que el daño sufrido por ella sobrevino como consecuencia única y directa de un acto de negligencia del médico recurrido; (2) la negligencia de un médico no puede establecerse con una mera prueba de que el tratamiento seguido resultó infructuoso o que un mal resultado sobrevino y de que (3) a la luz de los hechos pro-

bados no encontró acto u omisión del médico recurrido que indique negligencia, el tribunal de instancia declaró sin lugar la demanda en este caso.

La prueba consistió del testimonio de tres peritos médicos, el de la recurrente, el de un hijo de ella, el de la enfermera Noemí Muñoz, y de los récords del hospital. La prueba pericial fue conflictiva.

La recurrente testificó que cuando despertó de la operación tenía un gran dolor de cabeza y se encontró toda mojada en la cama; que llamó al Dr. Womble quien vino al día siguiente y al enterarse de la situación le admitió que "Mala suerte que usted tuvo en su operación . . . pues porque yo raspé demasiado la vejiga y noté que se perforaba." Luego explicó los distintos tratamientos y operaciones a que fue sometida con motivo de la fístula que se le desarrolló en la vejiga. Explicó los sufrimientos y angustias que ha pasado con tal motivo. Testificó sobre los gastos en que incurrió con motivo de su enfermedad ascendente a unos $668; que informó a sus abogados de la referida admisión que le hizo el Dr. Womble. Esto ocurrió antes de la toma de la deposición del Dr. Womble; que no le dijo a los doctores Rodríguez y Yordán de la referida admisión del Dr. Womble.

El perito de la recurrente, Dr. David Graubard testificó que su experiencia es en cirugía traumática en un 50% y el resto en cirugía general en hombres y mujeres; que no había hecho estudios o especialidad en ginecología o cirugía ginecológica. En cuanto a la causa de la fístula en cuestión declaró que su opinión era "que al hacer la histerectomía total el cirujano lesionó la vejiga por un pinche hemostático, por una hemorragia o por disección de la vejiga . . . del cuello de la matriz." Enseguida añadió que después de un estudio más cuidadoso "basado en los hechos subsiguientes" su opinión era que "una sutura puesta incorrectamente a través de la pared de la vejiga fue la causa básica de la fístula vesicovaginal. La razón para esto es que en 18 de

octubre de 1963, el primer día después de la operación, tenía sangre en la orina." Añadió que la mejor práctica era operar para la corrección de la fístula de 24 a 48 horas después que se descubría y que la capacidad normal de la vejiga es de 900 a 1000 c.c. En contrainterrogatorio admitió que en el récord no hay nada al efecto de que la recurrente estuviese perdiendo orina por la vagina. Dijo que esa aseveración estaba basada en una nota en la hoja de progreso sobre la incontinencia, o sea, retención luego de orinar, lo que no es indicativo de fístula; que el expeler coágulos de una pared post operatoria, después de una histerectomía, no se debe exclusivamente a fístula, pero añadió que guarda relación con una fístula. A preguntas del abogado de los recurridos testificó que la recurrente no tenía fístula el día 18 ni el día 19 de octubre; que "Posiblemente se formó el 23 ó 24"; que la eliminación de orina sin control y el humedecimiento de la cama se debía a la fístula; que es una práctica pobre no hacer examen de sangre y de orina antes de la operación; que el récord no demuestra que se hicieran; que las órdenes post operatorias se escribieron el día antes de la operación lo que tampoco es buena práctica.

El otro perito de la recurrente fue el Dr. Gilberto Rodríguez, especialista en urología. Testificó que en operaciones de histerectomía se producen fístulas en dos grupos de casos. Uno son los casos de descuido como "aquellos en que se corta directamente la pared de la vejiga y de la vagina con unas tijeras, con un bisturí . . . una pinza . . . una aguja al coger una sutura . . . una disección violenta con las manos . . . podría con el dedo perforarse la vejiga. Un retractor que se use para separar podría perforar la vejiga . . ."; que el segundo grupo es el de los casos en que la fístula no es debido a descuido, siendo estos casos aquellos en que la fístula se produce "debido al tumor . . . a un parto defectuoso . . . que la vejiga pueda tener un defecto, algunas enfermedades . . . como sífilis"; y que este caso no cae dentro del referido se-

gundo grupo. Dijo que "en cualquier cifra de operaciones de histerectomía hay siempre una incidencia [de fístula] de como un 10%" aunque se use la mejor técnica operatoria; que basado en el récord no cree que el Dr. Womble incurriera en negligencia de clase alguna en la operación de la recurrente. Testificó que no tenía experiencia en histerectomía. Dijo que debe esperarse de tres a seis meses después de la lesión antes de intentar cualquier procedimiento reparativo en casos de fístulas como éste; que una persona que no conozca esta regla no cualifica como urólogo; que la persona que dijera que el tratamiento de una fístula vesicovaginal tenía que hacerse en 24 ó 48 horas no la cualificaría como perito en la especialidad de ginecología y urología. Dijo que no había evidencia de que en este caso hubo una fístula que perforara la vejiga en el momento de la operación; que en este caso la fístula se produjo por necrosis; que es posible que pudiera haber sido causada por una degeneración o un disturbio de la afluencia de sangre; por una disminución de la afluencia de sangre causada por la operación. Testificó que era correcto el texto de ginecología de Novak que informa que "Aun el cirujano ginecólogo más terminado, más competente, haya alguna que otra vez causara alguna que otra vez inadvertidamente daño y han indicado que una laceración accidental de la vejiga ocurre en casi un 10% de la histerectomía"; que tal laceración puede ocurrir con carencia absoluta de negligencia; que "si en las primeras 48 horas de operado el paciente hay una fístula demostrable, grande, uno la operaría; yo la operaría. Si ya han pasado diez días no tendría duda alguna de que no la operaría. Ahora, en ese período entre dos y diez días es donde uno tiene que individualizar un caso. Por supuesto, cuando ocurre eso, la tendencia es esperar."

El Dr. Alberto Castañer, perito de los recurridos testificó que es miembro y está certificado en su especialidad desde el año 1958 por el American College of Obstetrics and Gine-

cology y por el American College of Surgery. Ha practicado no menos de cuatrocientas a quinientas histerectomías y es profesor de la Escuela de Medicina en su especialidad desde el año 1955. Declaró el Dr. Castañer que en una operación de histerectomía el riesgo más importante y constante es el lesionar la vejiga y los uréteres aunque se opere bajo las técnicas y el cuidado que se pueda dar. Testificó también que del récord operatorio surge que la operación practicada a la Sra. Emmanuelli fue una complicada por razón de la presencia de quistes con muchas adherencias en la parte posterior del cuello (de la matriz) y que cuanto más adherencias más difícil es establecer planos de operación y por consiguiente más trauma potencial hay. Señaló también que durante la operación la paciente sangró mucho oscureciendo el campo operatorio haciendo que la situación fuese más difícil de controlar por las constantes limpiezas y el tiempo adicional que hay que emplear; que la operación duró cuatro horas para poder extraer el cáncer localizado que tenía la demandante en el cuello de la matriz. En cuanto a operarla dentro de las 24 a 48 horas la experiencia demuestra que las probabilidades de éxito son menos, los tejidos no se restablecen si hay una necrosis, los tejidos no están restablecidos en 48 horas para someter a esa paciente a una operación con bastante éxito y que es mejor esperar a que los tejidos se limpien, se desinflamen y entonces actuar. Declaró asimismo que de acuerdo con su experiencia el Dr. Womble operó dentro de las normas aceptadas en Puerto Rico en la profesión y, al igual que el Dr. Gilberto Rodríguez, afirmó que él no podía a base del récord determinar indicio de negligencia de clase alguna. Testificó que la capacidad de una vejiga humana es de 400 a 450 centímetros cúbicos.

Se tomó una deposición del Dr. Womble ante el juez sentenciador en 15 de septiembre de 1965. Testificó que tiene 22 años de practicar en medicina general con especialidad en cirugía abdominal, habiendo realizado unas doscientas

histerectomías en unas cuatro de las cuales surgió la complicación de fístula vesicovaginal; que la recurrente Calixta Emmanuelli fue a su oficina en septiembre 30 de 1963 referida por el Dr. Remy Rodríguez para una consulta ginecológica debido a "lo que había encontrado el patólogo Donald Babbs . . . que había reportado un especimen de citología sospechosa. . . ." En 9 de octubre "el paciente regresó a mi oficina, le dije que el informe patológico era carcinoma . . . le dije que era una lesión maligna temprana, en otras palabras, que tenía cáncer en el sitio . . . le dije que era una lesión fatal a menos que fuera propiamente atendida; le dije que el tratamiento preferido era histerectomía abdominal; igualmente llamé al Dr. Remy Rodríguez y le informé de los hallazgos y del tratamiento recomendado y él me dijo . . . la paciente aceptó la recomendación y fue admitida para operación en octubre 16 de 1963 . . . en octubre 17 una histerectomía total fue practicada con una excisión del ovario derecho y tubo, fue llevada a cabo con éxito. La paciente fue dada de alta en el hospital en octubre 26 con una receta de continuar terapia antibiótica que había comenzado en octubre 18 para una cistitis post operatoria y se le dio cita para noviembre primero de 1963. En noviembre primero la paciente vino para su cita acordada y se hizo constar que estaba perdiendo la orina a través de su vagina constantemente y en tales cantidades que tenía que usar constantemente una toalla para su protección . . . . Le dije a la paciente que esto era una complicación de la operación y que tenía que ser rehospitalizada para exámenes incluyendo consultas con un urólogo; cuatro días luego, siendo el 5 de noviembre la paciente por fin fue hospitalizada . . . finalmente vino a ser hospitalizada y llamé al urólogo Gilberto Rodríguez para que viese el paciente en consulta. El doctor Gilberto Rodríguez examinó el paciente, hizo los exámenes apropiados y encontró que el paciente tenía una fístula vesicovaginal; a mi pedido el doctor Gilberto Rodríguez con-

tinuó atendiendo a la paciente por las complicaciones urológicas . . . . El paciente fue dado de alta en noviembre 16 de 1963 a cargo del doctor Gilberto Rodríguez; la última vez que vi a la paciente fue en la mañana de noviembre 16 de 1963 y en ese tiempo y a esa fecha acordamos el Dr. Gilberto Rodríguez y yo que seguiría bajo su tratamiento." En contrainterrogatorio testificó que "operé cuidadosamente observando todos los resguardos acostumbrados" y relacionó éstos. Dijo que ". . . Normalmente la mayor preocupación en una histerectomía abdominal es evitar lesionar la vejiga y la uretra." Dijo que no perforó la vejiga de la recurrente; que "Habían ciertas adherencias entre el ovario y el tubo de un lado e intestino en la misma área"; que la recurrente no tuvo síntomas de peritonitis indicativos de perforación de la vejiga; que luego de la operación la recurrente sufrió una cistitis que requirió caterización; que la primera indicación de la fístula fue en 23 de octubre "como resultado de una anormal conección entre la vagina y la vejiga"; que desde el día de la operación hasta la tarde del 23 de octubre visitaba a la recurrente diariamente y que no notó y ésta no le dijo que mojaba la cama de orines ni aparece tal cosa en el récord clínico del hospital; que "esta fístula vesicovaginal surgió por lo menos seis días después de la operación. Ella tuvo una cistitis post-operatoria durante esos seis días . . . no le hubiese ocurrido si no se le hubiese operado favorablemente, es una complicación de la operación." Preguntado si recordaba haberle dicho a la recurrente que había tenido mala suerte en esa operación, contestó que "No recuerdo haberle dicho tal cosa, pero creo que la tuvo. Cualquier persona que se le practique una histerectomía y le surja una fístula vesicovaginal tiene mala suerte."

La enfermera Noemí Muñoz, supervisora de la sala de operaciones, testificó que el récord de la operación de la recurrente le fue dictado a medida que se realizaba por el Dr. Womble, en parte a ella y al tenerse que ausentar ella,

en parte a la enfermera Conesa y al terminar la operación lo firmó el Dr. Womble; que ". . . Yo chequeo los récords y si veo que esos récords no están claros o no están presentables como deben estar, como debe estar un récord operatorio, yo, como supervisora de la sala, pasaba los récords en limpio." que ". . . al yo chequear el récord y ver que tenía letras distintas, tenía unos cuantos errores y estaba tachado, pues yo decidí pasarlo en limpio para que estuviera mejor presentado y así lo hice, pero dejando en el récord la parte que ya estaba firmada por el Dr. Womble y que nosotras habíamos cogido, esa parte permaneció en el récord"; que llevó la copia del récord que pasó en limpio para que la firmara el Dr. Womble pero que éste no la firmó. Se admitieron en evidencia copia fotostática del récord original y la copia pasada por la testigo. Testificó que "El pasarlo en limpio fue una idea exclusivamente mía." Fue ampliamente interrogada sobre alteraciones que hizo al copiar el historial de la operación dictado por el recurrido cirujano pero no se demostró en qué forma y manera y en qué extensión estas alteraciones tendieron a establecer que la fístula se formó por el descuido o negligencia del recurrido al realizar la histerectomía.

A continuación relacionamos la doctrina jurisprudencial aplicable a las circunstancias de este caso.

En *Sáez* v. *Municipio de Ponce*, 84 D.P.R. 535 (1962), reafirmamos la doctrina que establecimos en *Rivera* v. *Dunscombe*, 73 D.P.R. 819 (1952), con respecto a la responsabilidad del médico por los daños sufridos por un paciente. Huelga repetirla. En *Ramos Orengo* v. *La Capital*, 88 D.P.R. 315 (1963), reafirmamos la doctrina de que en ausencia de prueba en contrario, asiste a los profesionales la presunción de que en el desempeño de sus funciones han ejercido un grado de cuidado razonable y de que el tratamiento dado al paciente fue el adecuado. Corresponde al demandante controvertir esta presunción mediante prueba que demuestre

que existía algo más que una mera posibilidad de que los daños al demandante se debieron al incumplimiento por el médico de su obligación. En *Guzmán* v. *Silén*, 86 D.P.R. 532 (1962), dijimos que: "Un tribunal no está obligado a seguir indefectiblemente la opinión de un perito, sobre todo cuando el mismo está en conflicto con testimonios de otros peritos . . . ." y que "En los casos de 'malpractice' lo que es o no es una práctica profesional propia es una cuestión para los expertos y solamente puede establecerse con sus testimonios." En *Pérez* v. *E.L.A.*, 95 D.P.R. 745 (1968), un caso en que la presunción de que el médico ejerció el debido cuidado quedó controvertida por la prueba, dijimos a la pág. 753: "La práctica profesional de la comunidad, o prevaleciente en la comunidad cuando . . . se usa como norma . . . no quiere decir la práctica pobre sino la práctica que llena las exigencias profesionales reconocidas, o sea, la práctica aceptable profesionalmente hablando, en determinado lugar y tiempo."

■ Si la evidencia señala más de una causa probable del daño, no puede imponerse responsabilidad al médico a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades la causó. *Ritter* v. *Sivils*, 293 P.2d 211 (Ore. 1956).

■ En los casos de daño dentro del área de la operación hay circunstancias en que se ha aplicado la doctrina de *res ipsa loquitur* cuando, de acuerdo con los hechos, el daño no hubiese ocurrido en ausencia de negligencia de parte del médico demandado.

El caso de *Tomei* v. *Henning*, 431 P.2d 633 (Cal. 1967), es ilustrativo de este grupo. En este caso el demandado realizó una histerectomía a la demandante. Durante la operación accidentalmente le suturó el ureter derecho en dos partes lo que requirió luego la remoción del riñón derecho. El demandado admitió que suturó el uréter. Alegó fue un acci-

dente inevitable. Pero testificó que no tomó ciertas precauciones indicadas a que hicieron referencia los peritos médicos de identificación del uréter y de hacer pruebas para determinar si había sido lesionado. Uno de los peritos testificó que el suturar un uréter en dos sitios y el cerrar la herida sin usar técnica alguna para determinar la condición de los uréteres no constituía el ejercicio del debido cuidado por parte de un cirujano al realizar una histerectomía. Por lo tanto el tribunal concluyó que fue error no dar al jurado una instrucción condicional sobre *res ipsa loquitur*. Dijo que "Como la instrucción sobre *res ipsa* permite al jurado inferir negligencia de la mera ocurrencia del accidente, debe haber una base bien en la experiencia corriente o en el testimonio pericial de que cuando un accidente ocurre es más probable que sea debido a negligencia." [1]

■ Por el contrario, en otros casos de daños dentro del área de la operación, se ha resuelto que la doctrina de *res ipsa loquitur* no es de aplicación porque el daño, de por sí, no prueba la negligencia del demandado.

En *Siverson* v. *Weber*, 372 P.2d 97 (Cal. 1962), a los 10 días de una histerectomía apareció un escape de orina por la vagina de la paciente demandante. Se encontró una fístula vesicovaginal. La demandante testificó que el cirujano señaló hacia un cuadro sobre la mesa y dijo: "Debo haber puesto una sutura a través del 'bladder flap' (el tribunal dijo que este término se usaba para referirse a la reflección vesico-uterina de la membrana que cubre el interior de la cavidad abdominal) lo que causó la fístula." El cirujano negó haber dicho tal cosa y explicó que tal sutura es un pro-

---

[1] Véanse, además, *Clark* v. *Gibbons*, 426 P.2d 526 (Cal. 1967); *Landermans* v. *Hamilton*, 41 Cal. Rptr. 335 (1964); *Horner* v. *Northern Pacific Ben Ass'n. Hospital*, 382 P.2d 518 (Wash. 1963); *Gerbart* v. *Fresno Medical Group*, 31 Cal. Rptr. 633 (Cal. 1963); *CHO* v. *Hempler*, 2 Cal. Rptr. 167 (1960); *James* v. *Spear*, 338 P.2d 22 (Cal. App. 1959); *Guillen* v. *Martin*, 333 P.2d 266 (Cal. App. 1958); *Higdon* v. *Carlebach*, 83 N.W.2d 296 (Mich. 1957).

cedimiento normal que se hace en cada caso y no causa fístula. La paciente fue tratada por varios meses y la fístula fue cerrada mediante otra operación. Los peritos médicos convinieron que no puede determinarse la causa de una fístula que aparece varios días después de una histerectomía; que la fístula puede ocurrir aunque el cirujano haya tenido el cuidado y habilidad, generalmente poseída por ginecólogos de reputación en la comunidad y que el desarrollo de una fístula, aunque cosa infrecuente, se considera un riesgo inherente de la operación. Dijo el tribunal que "Es obvio que ni la causa de la fístula de la demandante ni la cuestión a la luz de la experiencia anterior, de si la fístula fue probablemente el resultado de la negligencia del demandado, es de conocimiento común entre legos. Ningún testigo médico testificó que en los casos infrecuentes en que ocurre una fístula, lo más probable es que es el resultado de negligencia. Como hemos visto, el testimonio fue que es considerada un riesgo inherente de la operación y que puede ocurrir aun cuando la operación se realiza con cuidado y de acuerdo a la práctica apropiada . . . . El hecho que el daño sufrido por la paciente como resultado de la operación ocurre infrecuentemente no prueba, de por sí, que la lesión se causó por la negligencia de los que estaban a cargo de la operación . . . . Permitir una inferencia de negligencia bajo la doctrina de *res ipsa loquitur* sólo porque se desarrolla una complicación poco común, colocaría una carga demasiado pesada sobre la profesión médica y puede resultar una limitación indeseable al uso de operaciones o procedimientos nuevos que envuelven un riesgo inherente de lesión aunque se use el debido cuidado." Concluyó que en casos como éste, no debe aplicarse la doctrina de *res ipsa loquitur* a menos que pueda decirse, a la luz de la experiencia anterior, que tal evento es más probable el resultado de negligencia que de otra causa por la que el demandado no es responsable.

En *Kniger* v. *Henderson,* 81 Cal. Rptr. 305, 309 (Cal. App. 1969), se distinguieron los hechos del de *Siverson,* supra, y se sostuvo la concesión de nuevo juicio a la demandante porque la prueba demostró que la fístula desarrollada en la paciente que sufrió una histerectomía fue causada por torcedura o compresión del uréter cuando el médico demandado colocó una pinza hemostática sobre una rama sangrante de la arteria uterina; que se adujo testimonio médico susceptible de interpretación de que tal lesión raramente ocurre en ausencia de negligencia de cirujano. (²)

Consideremos a continuación los apuntamientos de la recurrente a la luz del anterior resumen de la prueba y del derecho aplicable previamente expuesto.

■ 1.—Arguye la recurrente que el tribunal de instancia aplicó un criterio equivocado al aquilatar la prueba, el cual se ha descartado ante la situación de indefensión o inferioridad en que se encuentra la recurrente en casos de responsabilidad profesional.

Los casos citados por la recurrente no sostienen este apuntamiento. En unos, las circunstancias justificaban la inferencia de negligencia. (³) En *Dees* v. *Pace,* 257 P.2d 756 (Cal. App. 1953), se aplicó la doctrina que reafirmó el Tribunal Supremo de California en *Siverson* v. *Weber,* supra. En *Colvin* v. *Warren,* 163 S.E. 268 (Ga. App. 1932), sólo se denegó una excepción previa porque la demanda era suficiente al alegar que los médicos al realizar la operación

---

(²) Véanse, además, *Schofield* v. *Idaho Falls Latter Day Saints Hosp.,* 409 P.2d 107 (Idaho 1965); *Buchanan* v. *Downing,* 394 P.2d 269 (N. Mex. 1964); *Di Filippo* v. *Preston,* 173 A.2d 333 (Del. 1961); *Shockley* v. *Payne,* 348 S.W.2d 775 (Texas 1961); *Christian* v. *Widmington General Hospital Ass'n.,* 135 A.2d 727 (Del. 1957); *Bettigole* v. *Diener,* 124 A.2d 265 (Md. 1956); *Robinson* v. *Wirts,* 127 A.2d 706 (Pa. 1956).

(³) *Hundley* v. *St. Francis Hospital,* 327 P.2d 131 (Cal. App. 1958); *Goodwin* v. *Hertzberg,* 201 F.2d 204 (D.C. Cir. 1952); *Byrom* v. *Eastern Dispensary & Casualty Hosp.,* 136 F.2d 278 (D.C. Cir. 1943); *Christie* v. *Callahan,* 124 F.2d 825 (D.C. Cir. 1941).

innecesariamente cortaron la vejiga del demandante y otros órganos con el resultado que la vejiga no funcionaba normalmente. En *Luiscott* v. *Hughbanks*, 37 P.2d 26 (Kan. 1934), se resolvió que una pregunta hipotética al efecto de si los peritos médicos podían formular una opinión sobre si el cirujano que realizó una histerectomía y dos operaciones correccionales resultando en la lesión de un uréter, fístula en la vejiga y que el paciente sufre de una descarga continua de orina después de la tercera operación, usó el cuidado y destreza ordinarios que los cirujanos usan en la vecindad en tales operaciones, era una forma apropiada de hacerla pues al contestar que no, constituía un hecho del cual el jurado podía concluir que el cirujano fue negligente. La razón para admitir esta pregunta fue que cada hecho relacionado en la misma estaba sostenido por la prueba circunstancial y admisiones del demandado.

Ninguna otra razón aduce la recurrente que nos induzca a modificar o sustituir la doctrina imperante. Por el contrario, el récord demuestra que ella pudo conseguir dos médicos peritos que testificaron a su favor cuyo testimonio conflictivo fue correctamente aquilatado por el tribunal de instancia como demostraremos más adelante.

■ . 2.—Apunta la recurrente que el tribunal de instancia incidió al aplicar la doctrina de la práctica aceptada y seguida por la profesión médica porque se basó en una copia del récord de la operación la cual aparece alterada no teniendo el tribunal otra prueba de cómo se realizó la operación y que fue esa copia alterada del récord lo que sirvió al perito del recurrido para opinar que en la operación se siguió la práctica generalmente aceptada.

En el récord aparece copia fotostática del récord original dictado por el recurrido cirujano mientras realizaba la primera operación en este caso y firmado por él al concluirla. Debemos asumir que los peritos examinaron y basaron su testimonio tanto en esta copia del original admitida en evi-

dencia sin objeción de la recurrente, como en la copia que aparece en el récord del hospital con alteraciones y no firmada por el médico recurrido. La alteración que llama la atención es una adición al texto dictado por el recurrido durante la operación, el cual originalmente leía que "la vejiga fue separada (disecada) del cervix". La alteración consistió en añadir aquí la frase "mediante una separación (disección) suave con gasa." La ausencia de esta adición no necesariamente debía alterar la conclusión del perito y del tribunal de que la operación se realizó de acuerdo con prácticas establecidas y seguidas por la profesión para ese tipo de operación pues podía asumirse de una lectura del resto del récord original que la operación se llevó a cabo de acuerdo con tales prácticas como así lo afirmó el recurrido en el curso de su deposición. Como veremos más adelante, la recurrente arguye que el referido método de separación fue impropio. El tribunal de instancia tomó en consideración las discrepancias que aparecen en la copia del récord de la operación que hizo la enfermera Muñoz después de la operación y que el recurrido nunca firmó y concluyó, correctamente, a nuestro juicio, que "No consideramos . . . que hubiera algo sospechoso en el expediente clínico . . . lo único que preocupa al tribunal sobre el historial de la operación fue adecuadamente aclarado. . . ."

3.—Arguye la recurrente que al tribunal de instancia aplicar la referida doctrina ignoró que en este caso hubo desviaciones de la práctica en cuestión.

Si bien es cierto que el Dr. Graubard testificó que el récord no demuestra que se hicieran exámenes de sangre y orina inmediatamente antes de la operación (se habían hechos varios días antes) y que las órdenes post operatorias se escribieron el día antes de la operación, lo cual a su juicio es una práctica pobre, no se demostró que estas circunstancias contribuyesen en forma alguna al desarrollo u ocurrencia de la fístula.

Sostiene la recurrente que la disección de la vejiga con una gasa, según aparece del récord alterado está contraindicado porque debilita el tejido y causa necrosis. En apoyo cita un texto de medicina que, entre otras cosas, dice que el autor nunca usa una esponja o los dedos para empujar la vejiga apartándola del cervix y de la vagina. Por el contrario, el *testimonio* de los doctores Rodríguez y Castañer fue al efecto de que el récord no demostraba que el cirujano recurrido incurriese en alguna negligencia al llevar a cabo la histerectomía en cuestión. Específicamente sobre el mejor método de la referida disección el Dr. Castañer testificó que el método más sencillo de separar la vejiga "es una gasa con el dedo".

Apunta también la recurrente que el tratamiento post operatorio se apartó de las prácticas aceptadas. Asumimos que se base en el testimonio de la recurrente. Sin embargo, esto no está sostenido por el récord del hospital y está en claro conflicto con el testimonio del médico recurrido. Dirimida la cuestión por el tribunal de instancia, no encontramos justificación para intervenir con su apreciación de la prueba.

4.—Se señala que el tribunal de instancia no tomó en consideración el testimonio del perito Dr. Graubard.

■ Es cierto que no le dio crédito a dicha prueba pero no podemos convenir con la recurrente que el tribunal carecía de fundamento para ello. El testigo no era un especialista en el campo genito-urinario. Su opinión de que la fístula en este caso se debió a una sutura realizada incorrectamente a través de la pared de la vejiga no encuentra apoyo ni en el récord médico del caso ni en el testimonio del Dr. Rodríguez, perito de la recurrente y quien la operó para eliminar la fístula por lo que estaba en mejor posición que ningún otro de corroborar la opinión del Dr. Graubard sobre la causa de la fístula. Sin embargo, no se le preguntó específicamente sobre esto y si al operar encontró tal sutura o condición que en alguna forma justificase que se había hecho.

El testimonio del Dr. Graubard al efecto de que la fístula en casos como el que nos ocupa debe operarse a las 24 ó 48 horas después que se descubría, fue refutado y contradicho por el Dr. Gilberto Rodríguez con la aseveración de que el que dijera tal cosa no cualificaría como perito en ginecología y urología. Su testimonio sobre la capacidad de la vejiga fue contradicho por el Dr. Castañer.

Por el contrario, la conclusión del tribunal de instancia de que la fístula no ocurrió por descuido o negligencia del médico recurrido está ampliamente sostenida por la prueba. Ésta demuestra que la fístula es más bien un riesgo inherente en toda histerectomía y puede ocurrir aun cuando la operación se realice con cuidado y de acuerdo a la práctica aceptada y seguida por la profesión médica en tales casos. *Siverson* v. *Weber*, supra.

■ 5.—Apunta la recurrente que el tribunal hizo caso omiso del testimonio del Dr. Gilberto Rodríguez sobre todas las posibles causas de la fístula y que la que se desarrolló en este caso está en el grupo de las causadas por descuido o negligencia, testimonio que justificaba aplicar la doctrina de *res ipsa loquitur*.

Si bien es cierto que el testimonio del Dr. Rodríguez en parte sostiene la inferencia de que la fístula en este caso cae dentro del grupo de las que ocurren por descuido, no es menos cierto que este testigo testificó que en las histerectomías existe una incidencia de fístula en un 10% de los casos; que la fístula pudo ocurrir por degeneración o disturbio o disminución de la afluencia de la sangre; que la *laceración de la vejiga en estos casos puede ocurrir* con carencia absoluta de negligencia y que, basado en el récord, no creyó que el Dr. Womble incurriera en negligencia de clase alguna en la operación de la recurrente.

Asimismo, el Dr. Castañer testificó que el riesgo más grande en una histerectomía es una necrosis, o sea, daño a la vejiga y los uréteres aunque se opere bajo las técnicas y

el cuidado que se pueda dar; que la operación en este caso fue muy complicada por la presencia de quistes y la profusión de sangre; que el Dr. Womble operó dentro de las normas aceptadas en Puerto Rico; y que no podía, a base del récord, determinar indicio alguno de negligencia en este caso.

Como dijo el tribunal en *Siverson* v. *Weber*, supra, en casos como éste no es permisible una inferencia de negligencia.

■ 6.—El tribunal no le dio crédito al testimonio de la recurrente constitutivo de una admisión del Dr. Womble de que durante la operación "había raspado la vejiga" testimonio que no fue contradicho.

Este testimonio no fue contradicho por la única persona que lo podía contradecir que era el Dr. Womble. La razón es obvia. Durante su deposición (la que se hizo necesaria porque el testigo se ausentaba para ingresar en un seminario para estudiar el sacerdocio) el Dr. Womble fue interrogado sobre todos los aspectos del caso. Sus abogados, presumiblemente, no tenían conocimiento de la alegada admisión. Sin embargo, la recurrente, que tenía tal conocimiento, no se ocupó de interrogarlo sobre la misma. Por otra parte, del testimonio del Dr. Womble resulta dudoso que la hiciese. Tanto los récords de la recurrente como paciente del hospital recurrido con motivo de la histerectomía a que allí fue sometida, como el testimonio del Dr. Womble, y en cierto grado el del Dr. Rodríguez, contradicen y refutan el de la recurrente al efecto de que al despertar de la operación notó que mojaba la cama con orina insinuando que desde ese momento existía la fístula (lo que significaba que se había perforado la vejiga durante la operación) en cuestión. Los peritos estuvieron contestes en que esta complicación apareció a los seis días de la operación de manera que la fístula se desarrolló por necrosis de tejido de la vejiga. Esta circunstancia tendía a restarle credibilidad al testimonio de la recurrente. No existe justificación en el récord, por lo tanto, para concluir

que el tribunal de instancia abusó de su discreción al negarle crédito al testimonio de la recurrente sobre la referida admisión.

7.—Al apuntar que el tribunal de instancia pasó por alto la disposición del Art. 162 de la Ley de Evidencia, la recurrente arguye que no se trajo al Dr. Womble para explicar la cuestión de la copia alterada del récord de la operación ni se adujo el testimonio de los anestesistas y otros asistentes mencionados en el récord de la operación, prefiriendo descansar en el récord débil e insatisfactorio de la enfermera Noemí Muñoz, razón por la cual el tribunal debió considerar con sospecha el testimonio de ésta, la copia del informe y el récord en su totalidad.

El apuntamiento carece de mérito pues de las conclusiones de hecho aparece que el tribunal de instancia en lo que al historial de la operación se refiere descansó en la copia fotostática del historial dictado por el Dr. Womble durante la operación y firmado por él y no en la copia del mismo hecho por la enfermera Muñoz y que aparece con interlineados y otras alteraciones.

8.—Apunta la recurrente que el balance más racional, justiciero y jurídico de toda la prueba señala hacia una conclusión distinta a la que llegó el tribunal de instancia.

El resumen que hemos hecho de la prueba y el análisis de la misma no sostienen este apuntamiento.

Basta repetir que hay justificación en la prueba para que el tribunal de instancia (1) no diese crédito a la alegada admisión de negligencia del Dr. Womble, así como al testimonio del Dr. Graubard; (2) por el contrario, diese crédito al testimonio de los doctores Rodríguez y Castañer de que la fístula es un riesgo inherente en la operación de histerectomía aun ejerciéndose el mayor cuidado y destreza de acuerdo a la práctica aceptada y seguida por la profesión médica en estos casos; (3) no aplicase la doctrina de *res ipsa loquitur* en armonía con lo resuelto en *Siverson* v. *Weber,* supra; y

(4) concluyese que el Dr. Womble no incurrió en un descuido o negligencia durante la operación de la recurrente que en derecho justificase imponer a él y al hospital recurrido responsabilidad por los daños sufridos por la recurrente.

En vista de lo expuesto, *debe confirmarse la sentencia del tribunal de instancia que desestimó la demanda en este caso.*

El Juez Asociado Señor Hernández Matos disintió. El Juez Asociado Señor Dávila no intervino.